

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Carlos Roselló Puig<br><br>Recurrido<br><br>v.<br><br>Ruth N. Rodríguez Cruz<br><br>Peticionaria | Certiorari<br><br>2011 TSPR 148<br><br>183 DPR ___ |

Número del Caso: CC      - 2006 - 1031

Fecha: 11 de octubre de 2011

Tribunal de Apelaciones:

    Región Judicial de Bayamón Panel VI

Jueza Ponente:

    Hon. Migdalia Fraticelli Torres

Abogada de la Parte Peticionaria:

    Luccianna M. Rechany Escudero

Abogado de la Parte Recurrida:

    Lcdo. Héctor M. Collazo Maldonado
    Lcdo. Alfredo E. González Vega

Materia:      División Comunidad de Bienes

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Carlos Roselló Puig

    Recurrido

       v.                    CC-2006-1031     Certiorari

Ruth N. Rodríguez Cruz

    Peticionaria

Opinión del Tribunal emitida por el Juez Asociado señor Kolthoff Caraballo

San Juan, Puerto Rico, a 11 de octubre de 2011.

En esta ocasión nos corresponde determinar si surte efectos en nuestra jurisdicción un contrato suscrito en el estado de Florida por unos cónyuges puertorriqueños sujetos al régimen de la sociedad de bienes gananciales, mediante el cual transfieren a uno solo de éstos la titularidad exclusiva de un bien inmueble sito en ese estado. Por los fundamentos que se discuten en la Opinión, respondemos tal interrogante en la afirmativa.

I

La Sra. Ruth N. Rodríguez Cruz y el Sr. Carlos Roselló Puig contrajeron nupcias el 25 de junio de 1978 en San Juan, Puerto Rico. El régimen económico bajo el cual constituyeron su

matrimonio fue el de la sociedad de bienes gananciales. Luego de concretado el vínculo matrimonial, los cónyuges vivieron y adquirieron varios bienes inmuebles en la Isla. Posteriormente se mudaron al estado de Florida donde adquirieron una propiedad inmueble en el condado de Seminole.

Ahora bien, mediante una escritura intitulada "Warranty Deed", otorgada por el matrimonio en el estado de Florida el 29 de abril de 1997, y según lo permiten las leyes de ese estado,[1] el señor Roselló Puig le transfirió su participación en el inmueble sito en el condado de Seminole a la señora Rodríguez Cruz por la cantidad de diez dólares "and other valuable consideration". El propósito del contrato fue que, a tenor con las leyes del estado de Florida, la propiedad dejara de ser ganancial y se convirtiera en una privativa de la esposa.

El 7 de abril de 2003, el vínculo matrimonial se declaró disuelto cuando el Tribunal de Primera Instancia, Sala Superior de Bayamón, decretó el divorcio por la causal de separación. Sin embargo, no se procedió con la

---

[1] La Sec. 708.09 del Florida Statutes establece:

> § 708.09. Married women's rights; agreements with husband, power of attorney, etc.
>
> Every married woman may enter into agreements and contracts with her husband, may become the partner of her husband or others, may give a power of attorney to her husband, and may execute powers conferred upon her by her husband, including the power to execute and acknowledge all instruments, including relinqishments of dower, conveying, transferring, or encumbering property, or any interest in it, owned by her, or by herself and her husband as tenants by the entirety, or by her husband. All powers of attorney heretofore executed by a wife to her husband and vice versa, and the execution of all documents executed thereunder, are hereby validated and confirmed.

división de bienes gananciales de inmediato, sino que se configuró una comunidad de bienes posganancial. Estando en comunidad, la señora Rodríguez Cruz vendió el inmueble sito en el estado de Florida.

El 27 de octubre de 2003, el señor Roselló Puig presentó una demanda mediante la cual solicitó la división de la comunidad de bienes posganancial generada entre él y su ex esposa. Entre otras cosas, adujo que el producto de la venta del inmueble localizado en el estado de Florida era parte de la comunidad y no privativo de su excónyuge. Alegó que si bien fue transferido a la señora Rodríguez Cruz durante la vigencia del matrimonio, él continuó realizando los pagos del préstamo hipotecario del inmueble hasta agosto de 2003, fecha en que la señora Rodríguez Cruz lo vendió por la cantidad de $450,000.

Manifestó que en vista de que la propiedad fue adquirida mientras estaban casados, ésta le pertenecía a la sociedad de bienes gananciales aun cuando se encuentra a nombre de uno de los consortes. A esos efectos, adujo que el 50% del dinero producto de esa venta le correspondía a él, ya que el inmueble le pertenece a la comunidad que es objeto de la división o que, en su defecto, se le debía reconocer el crédito correspondiente.

La señora Rodríguez Cruz contestó la demanda y admitió que, vigente el matrimonio, compareció junto a su ex marido como codeudora de la deuda hipotecaria asumida por ambos para la obtención del inmueble. Ahora bien,

alegó que el inmueble debía ser considerado privativo puesto que posteriormente ella lo adquirió mediante un contrato otorgado al amparo de las leyes del estado de Florida, jurisdicción donde se permite la contratación entre cónyuges. A esos efectos, aclaró que "[l]as mensualidades de la hipoteca fueron satisfechas con bienes de la Sociedad Legal de Gananciales desde que la misma fue incurrida hasta aproximadamente el mes de agosto de 2003".[2] Por ello, reclamó ser acreedora de un crédito por concepto del dinero privativo que tuvo que utilizar al momento de la venta del inmueble para satisfacer el resto de la deuda hipotecaria.

El señor Roselló Puig replicó lo referente al crédito solicitado. Sin embargo, al refutar la procedencia del crédito, se mostró conforme con el carácter privativo de la propiedad. Esto es, al reconocer que en efecto la titularidad exclusiva de la propiedad de Florida había sido cedida a su excónyuge, expresó:

> La demandada a trav[é]s de esta cesión no tan s[ó]lo acept[ó] toda participación de la referida propiedad, sino tambi[é]n la obligación económica futura que esto conllevaba, por tanto[,] y como expresa en la Contestación de la demanda, existen unos créditos de la Sociedad Legal de Gananciales, no obstante, no existen créditos a favor de la demandada ya que simplemente ella cumplió con su obligación econ[ó]mica para con su bien privativo.[3]

---

[2] Apéndice de la Petición de *certiorari*, pág. 80.

[3] Apéndice de la Petición de *certiorari*, pág. 85.

Así las alegaciones, el 7 de diciembre de 2004 el Tribunal de Primera Instancia celebró una vista para la discusión de varios asuntos, entre ellos, la controversia surgida en cuanto a si el inmueble sito en el estado de Florida era un bien ganancial o privativo. Las partes acordaron presentar escritos mediante los cuales fundamentarían sus respectivas posiciones.

El 13 de diciembre de 2004, el señor Roselló Puig acudió al foro primario en auxilio de su jurisdicción para que le ordenara a su ex esposa que consignara los frutos de la venta del inmueble hasta que se resolviera la controversia definitivamente. Se fundamentó en que, como consideraba que la propiedad formaba parte de la comunidad de bienes que pretendía dividir, se afectaría su derecho a la parte del producto de la venta que le correspondía, pues la señora Rodríguez Cruz había aceptado que utilizaba ese dinero para cubrir gastos personales.

La señora Rodríguez Cruz, por su parte, se reafirmó en que la propiedad se tenía que considerar como un bien privativo suyo, por lo que "estaba en su pleno derecho de disponer de ese bien según sus deseos sin crédito alguno a la Sociedad Legal de Gananciales[] ni a la Comunidad de Bienes Posdivorcio[]".[4]  Además, aprovechó la alegación para llevar a la atención del tribunal que el propio señor Roselló Puig en su escrito admitió el carácter privativo del bien, por lo que solicitó que esa expresión

---

[4] Apéndice de la Petición de *certiorari*, pág. 102.

se considerara como una "admisión de parte" sobre la naturaleza privativa del inmueble. En fin, la señora Rodríguez Cruz le solicitó al tribunal primario que dictara sentencia sumaria a su favor puesto que entendía que la existencia de la escritura intitulada "Warranty Deed" hacía incontrovertible la naturaleza privativa del inmueble.

El Tribunal de Primera Instancia acogió la solicitud y dictó una sentencia sumaria parcial.[5] Concluyó que el señor Roselló Puig le había transferido a su ex esposa la titularidad exclusiva del inmueble mediante el "Warranty Deed". Determinó que de acuerdo a las leyes del estado de Florida, donde se permite la contratación entre cónyuges, ese negocio jurídico fue válido. Explicó que las leyes de esa jurisdicción eran las que aplicaban a la controversia en vista de que los Arts. 10 y 11 del Código Civil de Puerto Rico establecen que las leyes aplicables a los bienes inmuebles y a los contratos que los afectan son las del lugar en que está sita la propiedad inmueble. A base de lo anterior, dictaminó que el bien inmueble era privativo de la señora Rodríguez Cruz, por lo que no procedía la consignación del producto de la venta de éste, ya que quedaba excluido de los procedimientos de división de la comunidad.

---

[5] A pesar de que el foro primario la tituló "Sentencia Sumaria Parcial", en realidad era una resolución interlocutoria en la cual se resolvió únicamente la controversia relativa al bien inmueble en cuestión.

Insatisfecho con ese dictamen, el señor Roselló Puig acudió mediante recurso de *certiorari* al Tribunal de Apelaciones. Adujo que el foro primario había errado al determinar que la prohibición de contratación entre cónyuges —establecida en los Arts. 1286 y 1347 del Código Civil de Puerto Rico— no aplica cuando el negocio jurídico versa sobre la compraventa de un bien inmueble sito en el estado de Florida. Expuso que esa decisión es contraria al estado de derecho vigente, pues éste "reconoce la unicidad del patrimonio matrimonial, sin distinción entre bienes muebles e inmuebles cuando se trata de conflictos entre los cónyuges exclusivamente (sin afectar terceras personas)".[6]

Además, alegó que realmente "nunca fue la intención de las partes hacer una donación o venta entre marido y mujer",[7] sino que otras consideraciones lo llevaron a suscribir tal contrato.[8] No obstante, a pesar de esa alegación, lo que solicitó fue que se revocara al foro primario para que se estableciese "que las donaciones o compraventa recíprocas entre marido y mujer est[á]n proh[i]bidas a[u]n cuando el bien inmueble adquirido por

---

[6] Apéndice de la Petición de *certiorari*, págs. 48-49.

[7] Íd., pág. 47.

[8] El señor Roselló Puig manifestó que el contrato se suscribió a los fines de proteger la propiedad por si en el futuro surgían acreedores suyos, que éstos no pudieran hacerse con el bien en cobro de la deuda, pues su esposa constaría legalmente como única titular del inmueble. Véase Apéndice de la Petición de *certiorari*, pág. 90. Con relación a la naturaleza de esta alegación, ese asunto no se encuentra ante nuestra consideración en este recurso, por lo que corresponderá al foro de instancia atenderlo en su día.

dicha Sociedad Legal de Gananciales est[á] fuera de la jurisdicción de Puerto Rico".[9]

El Tribunal de Apelaciones acogió el recurso y revocó el dictamen del foro primario. Concluyó que "[l]a cesión o transferencia simulada que realizó el señor Roselló a la señora Rodríguez no cambió la naturaleza ganancial del inmueble, porque en Puerto Rico, vigente el matrimonio, los cónyuges no pueden alterar la naturaleza del bien, aunque estuviera ubicado en otro país o estado, la sociedad no puede donar ni vender el bien a uno de los cónyuges, ni éstos disponer de su participación ganancial para favorecer a uno solo de ellos".[10] Para concluir lo anterior, el foro recurrido se fundamentó en que aun cuando la ley del estado de Florida permite la adquisición de un bien ganancial por uno de los cónyuges, su aplicación en Puerto Rico implicaría trastocar sustancialmente nuestra norma de derecho civil que prohíbe a los cónyuges realizar contratos y donaciones entre sí.

A base de lo anterior, el tribunal *a quo* determinó que, en vista de lo expresado en <u>Toppel v. Toppel</u>, 114 D.P.R. 775 (1983), no era aplicable a los hechos del caso de autos el Art. 10 del Código Civil de Puerto Rico,[11]

---

[9] Apéndice de la Petición de *certiorari*, pág. 56.

[10] Sentencia del Tribunal de Apelaciones, Región Judicial de Bayamón, 29 de septiembre de 2006, KLCE200500488, pág. 21.

[11] Este precepto legal establece que "[l]os bienes muebles están sujetos a la ley de la nación del propietario; los bienes inmuebles, a las leyes del país en que están sitos". Art. 10 del Código Civil, 31 L.P.R.A. sec. 10.

sino que aplicaba el Art. 11 en su modalidad de efecto atenuado.[12] De esta forma, dispuso que el bien inmueble sito en el estado de Florida era uno ganancial, pues "[a]unque el traspaso a la señora Rodríguez y la venta subsiguiente del inmueble a un tercero fueran válidas según las leyes de Florida, el bien nunca salió idealmente del patrimonio ganancial, porque no podía salir, por donación ni compraventa, para integrarse al patrimonio de uno solo de los cónyuges". (Énfasis omitido.)[13]

Ahora bien, como aplicó esa disposición estatutaria en su modalidad de efecto atenuado, el foro apelativo intermedio reconoció, al amparo de las leyes del estado de Florida y para propósitos de la titularidad actual, la validez y la eficacia de la enajenación del bien inmueble realizada por la señora Rodríguez Cruz al tercero adquirente. En consecuencia, tras establecer que el dinero recibido de esa compraventa sustituyó al inmueble en el patrimonio ganancial, ordenó al foro primario que lo colacionara como activo ganancial a adjudicarse por la mitad entre ambos excónyuges.

---

[12] En lo pertinente, esta disposición estatutaria establece que "las leyes prohibitivas concernientes a las personas, sus actos o sus bienes, y las que tienen por objeto el orden público y las buenas costumbres, no quedarán sin efecto por leyes o sentencias dictadas... en países extranjeros". Art. 11 del Código Civil, 31 L.P.R.A. sec. 11.

[13] Sentencia del Tribunal de Apelaciones, *supra*, pág. 24. El Juez Asociado señor Martínez Torres, quien fuera el Presidente del Panel que atendió este pleito en el Tribunal de Apelaciones, concurrió con el resultado del caso, pero discrepó de esta conclusión a la que llegó el mencionado foro. Específicamente, el Juez Martínez Torres fundamentó su opinión concurrente en un planteamiento similar al que esbozamos en esta Opinión.

En desacuerdo con el dictamen del Tribunal de Apelaciones, la señora Rodríguez Cruz acudió ante nuestra consideración. Esencialmente, adujo que había errado el foro recurrido al determinar que la compraventa realizada entre los excónyuges produjo efectos ante terceros pero que, al margen de lo dispuesto en el mencionado Art. 10, ello no tuvo el efecto de transferir el título del bien a su patrimonio. Manifestó que, en vista de que el bien inmueble estaba sito en el estado de Florida, incidió ese foro al obviar la figura de *lex rei sitae* codificada en ese artículo, contraviniendo así las doctrinas de conflicto de leyes, de entera fe y crédito, y de igual protección de las leyes.

En cuanto a la doctrina de entera fe y crédito, expresó que el Tribunal de Apelaciones dictaminó incorrectamente al no reconocer la efectividad de las leyes del estado de Florida en relación con un negocio jurídico efectuado según las leyes de ese estado sobre un bien inmueble sito allí. Sobre la igual protección de las leyes, señaló que estaba en desacuerdo con que dicho foro apelativo aplicara de manera diferente las leyes del estado de Florida y de Puerto Rico a la señora Rodríguez Cruz y al tercero adquirente, concediéndole a éste derechos que a ella le negó.

En atención a estas alegaciones, el 26 de enero de 2007 expedimos el auto solicitado. Ambas partes han comparecido. Procedemos a resolver.

II

El alcance jurídico del matrimonio es uno bidimensional: surte efectos personales y patrimoniales. En el plano personal, el enlace de los consortes hace que éstos se deban mutuamente la cohabitación, la fidelidad, el socorro y la protección.[14]

Por otro lado, al contraer nupcias, los cónyuges también configuran el régimen patrimonial que regirá su matrimonio; régimen de bienes, de deberes y derechos patrimoniales. La constitución de ese régimen puede realizarse mediante el previo otorgamiento de un contrato de capitulaciones matrimoniales.[15] No obstante, ante la ausencia de pacto o la insuficiencia de esas capitulaciones matrimoniales, nuestro Código Civil establece que el régimen económico que regirá el matrimonio será la sociedad legal de bienes gananciales.[16]

La existencia del régimen de sociedad de bienes gananciales implica que los cónyuges son condueños y coadministradores de la totalidad del patrimonio matrimonial, por lo que ostentan la titularidad conjunta de éste sin distinción de cuotas.[17] Por esta razón,

---

[14] Arts. 88 y 89 del Código Civil, 31 L.P.R.A. secs. 281 y 282.

[15] Art. 1267 del Código Civil, 31 L.P.R.A. sec. 3551. Véase, además, Domínguez Maldonado v. E.L.A., 137 D.P.R. 954, 964 (1995).

[16] Art. 1267 del Código Civil, 31 L.P.R.A. sec. 3551.

[17] Montalvo v. Rodríguez, 161 D.P.R. 411, 420 (2004).

independientemente de que se adquieran para uno solo de los consortes,[18] "[s]e reputan gananciales todos los bienes del matrimonio, mientras no se pruebe que pertenecen privativamente al marido o a la mujer".[19] De igual manera, todas las deudas y obligaciones del matrimonio se reputan gananciales a menos que se demuestre lo contrario.[20]

En vista de lo anterior, tras la disolución del matrimonio, cuestión que provoca *ipso facto* la extinción de la sociedad legal de bienes gananciales, los exconsortes "harán suyos por mitad… las ganancias o beneficios obtenidos indistintamente por cualquiera de los [ex] cónyuges durante el mismo matrimonio".[21] Y es que "[e]l divorcio lleva consigo la ruptura completa del vínculo matrimonial y la separación de propiedad y bienes de todas clases entre los cónyuges".[22] No obstante, en la práctica, la liquidación de los bienes comunes no necesariamente se produce de manera contemporánea al divorcio, sino que tras decretarse disuelta la sociedad legal de bienes gananciales, surge una comunidad de bienes ordinaria entre los excónyuges.[23]

---

[18] Art. 1301 del Código Civil, 31 L.P.R.A. sec. 3641.

[19] Art. 1307 del Código Civil, 31 L.P.R.A. sec. 3647.

[20] Art. 1308 del Código Civil, 31 L.P.R.A. sec. 3661; WRC Props., Inc. v. Santana, 116 D.P.R. 127, 134-135 (1985).

[21] Art. 1295 del Código Civil, 31 L.P.R.A. sec. 3621.

[22] Art. 105 del Código Civil, 31 L.P.R.A. sec. 381.

[23] Montalvo v. Rodríguez, *supra*, págs. 421-422.

El patrimonio que conforma esta comunidad de bienes, conocida como comunidad posganancial, consta de los bienes que fueron gananciales, cuya titularidad pertenece a ambos excónyuges. Así, pues, ésta se mantiene indivisa hasta que se procede con la liquidación de la sociedad de bienes gananciales. Por ello, al momento de proceder con la liquidación de dicha sociedad, se requiere realizar un inventario actualizado sobre los activos y pasivos acumulados.[24]

El inventario actualizado es requerido puesto que, cuando esta operación se pospone, el monto de los activos y pasivos puede variar debido a los posibles cambios y operaciones que hayan acaecido en relación al caudal común. Por eso hemos establecido que "en la adjudicación final de la participación que le corresponde a cada ex cónyuge, debe tomarse en consideración, de acuerdo con la evidencia sometida, si uno de los ex cónyuges puede interponer frente al otro un crédito por los cambios y las operaciones que ocurrieron en el haber común". (Énfasis omitido.)[25]

Por ejemplo, ese es el caso en que, vigente la comunidad posganancial, uno de los excónyuges adquiere para sí otros bienes con fondos comunes. Ante esa situación, habiéndose disuelto la sociedad de gananciales, el bien le pertenece de manera privativa a ese comunero,

---

[24] Art. 1316 del Código Civil, 31 L.P.R.A. sec. 3691.

[25] Montalvo v. Rodríguez, *supra*, págs. 422-423.

ello "sin perjuicio del 'crédito a favor de la comunidad postganancial por el importe actualizado de los fondos comunes utilizados'".[26] En este sentido, no surte efectos la figura de subrogación real debido a la inexistencia de la sociedad de gananciales.[27]

Ahora bien, ¿qué figura opera cuando unos cónyuges sometidos al régimen de la sociedad legal de bienes gananciales adquieren un bien inmueble en una jurisdicción en la que se permite la contratación entre éstos y transcurrido algún tiempo optan por transferir la titularidad de éste a uno solo de los consortes según lo permiten las leyes de la jurisdicción en que el inmueble está sito? Esta situación contrapone disposiciones estatutarias contenidas en nuestro Código Civil. Delineemos, pues, la normativa aplicable.

### III

De entrada, téngase en cuenta que nuestro ordenamiento jurídico prohíbe la contratación entre cónyuges sujetos al régimen de la sociedad legal de bienes gananciales, con excepción de los convenios permitidos en las capitulaciones matrimoniales y de la otorgación de contratos de mandato para delegar en uno de los cónyuges la administración o disposición de bienes comunes.[28]

---

[26] Íd., pág. 426.

[27] Íd.

[28] Arts. 91 y 1267 del Código Civil, 31 L.P.R.A. secs. 284 y 3551.

Asimismo, tampoco podrán los consortes "venderse bienes recíprocamente, sino cuando se hubiese pactado la separación de bienes, o cuando hubiera separación judicial de los mismos bienes".[29] El origen de la normativa que prohíbe la venta recíproca entre cónyuges se ha asociado con el principio de la inmutabilidad del régimen económico matrimonial,[30] pues una vez éste ha sido seleccionado no pueden los consortes alterar la composición de la masa común mediante actos dispositivos entre ellos.

Por otro lado, y al margen de estas excepciones, el Art. 1286 del Código Civil, 31 L.P.R.A. sec. 3588, también prohíbe el que los cónyuges se donen bienes durante el matrimonio a no ser que se trate de regalos módicos en ocasión de regocijo familiar. Respecto a la prohibición de donaciones mutuas entre los cónyuges, nos explica el Prof. Raúl Serrano Geyls que ésta responde más bien "a la necesidad de evitar influencias, coacciones y abusos que el cónyuge más fuerte podría ejercer sobre el más débil".[31]

Ahora bien, es menester señalar que el Art. 1286 de nuestro Código Civil tiene su origen en el Art. 1.334 del Código Civil español. En ese sentido es interesante denotar que el 13 de mayo de 1981 se suprimieron las

---

[29] Art. 1347 del Código Civil, 31 L.P.R.A. sec. 3772.

[30] Art. 1272 del Código Civil, 31 L.P.R.A. sec. 3556.

[31] R. Serrano Geyls, Derecho de familia de Puerto Rico y legislación comparada, San Juan, Ed. Programa de Educación Jurídica Continua de la Universidad Interamericana de Puerto Rico, 1997, Vol. I, pág. 317.

limitaciones al poder de disposición de los cónyuges en el Código Civil español.  De hecho, previo a esa eliminación, los comentaristas españoles ya apuntaban que esas prohibiciones a las donaciones mutuas entre los consortes eran **"prohibiciones que no afecta[ban] el orden público español, por lo que pod[ían] ser desconocidas por un donante extranjero"**. (Énfasis suplido.)[32]

En el caso de autos, y como señalamos, la propiedad en controversia fue transferida a la peticionaria por la cantidad de diez dólares, precio que es uno nominal, pues es evidente que el valor de cualquier inmueble en el estado de Florida excede de manera considerable tal cantidad.  En ese sentido es igualmente evidente entonces que nos encontramos ante una donación disimulada o simulación relativa contractual.  En *Banco Popular v. Registrador*, 172 D.P.R. 448, 454 (2007), señalamos que la donación disimulada o simulación relativa contractual ocurre:

> cuando los contratantes llevan a cabo un negocio jurídico aparente que encubre otro real con causa lícita, fingido o disimulado. En específico, hemos resuelto que hay una donación disimulada en un contrato de compraventa cuando la causa de dicho contrato no es onerosa, sino que responde a la mera liberalidad de uno de los contratantes, el donante.[33]

**IV**

---

[32] A. Marín López, <u>Comentarios a las Reformas del Código Civil</u>, 1977, Vol. I, pág. 539.

[33] Véanse, además: <u>Díaz García v. Aponte Aponte</u>, 125 D.P.R. 1 (1989), <u>La Costa Sampedro v. La Costa Bolívar</u>, 112 D.P.R. 9 (1982), <u>Hernández Usera v. Srio. De Hacienda</u>, 86 D.P.R. 13 (1962).

La controversia que tenemos ante nuestra consideración nos obliga a adentrarnos en materia de derecho internacional privado, ya que fue en el estado de Florida -cuyas leyes permiten la contratación entre los consortes- donde los excónyuges suscribieron el contrato traslativo de titularidad de un inmueble ganancial sito allí. No obstante, es importante recordar que en materia de "derecho internacional privado se consideran extranjeras entre sí aquellas jurisdicciones con legislación propia sobre determinadas materias, cuyas legislaciones pueden venir en conflicto unas con otras, **aunque esas jurisdicciones no sean necesariamente extranjeras a los fines del derecho internacional público".** (Énfasis suplido.)[34] Precisamente, ese es el caso de países organizados federalmente como por ejemplo Estados Unidos de América, en el que las legislaciones de los diferentes estados dan margen a que se generen conflictos de leyes. Dichos conflictos suelen encontrar solución en la aplicación de normas o principios del derecho internacional privado.

En cuanto a las relaciones jurídicas que se suscitan entre cónyuges, y en el marco del derecho internacional privado, nos comenta Miaja de la Muela lo siguiente:

> Una de las cuestiones especiales de mayor trascendencia, dentro de las relaciones entre cónyuges, en Derecho internacional privado, es la ley que rige la posibilidad jurídica de contratos de donación, venta o sociedad entre

---

[34] Armstrong v. Armstrong, 85 D.P.R. 404, 409 (1962).

ellos, que unas legislaciones permiten y otras prohíben. Luchan, en este caso particular, como siempre, la ley nacional de los esposos y el Derecho local, con su excepción de orden público, que será o no aplicable según lo riguroso de la prohibición en el respectivo ordenamiento.[35]

**V**

En la actualidad, los problemas que se generan en nuestra jurisdicción en materia de derecho internacional privado son atendidos por los Arts. 9 (estatuto personal), 10 (estatuto real) y 11 (estatuto formal) del Código Civil de Puerto Rico.

El estatuto personal (Art. 9) establece que "[l]as leyes relativas a los derechos y deberes de familia, o al estado, condición y capacidad legal [de] las personas, obligan a los ciudadanos de Puerto Rico, aunque residan en países extranjeros".[36] Es de notar que este estatuto, tal como lo indica su calificativo, surte efectos precisamente **sobre la persona**, no sobre sus bienes. Por lo tanto, a modo de ejemplo, el Art. 9 del Código Civil es determinante ante controversias relacionadas con el contenido del matrimonio, del régimen matrimonial y del contrato sobre bienes con ocasión de matrimonio (capitulaciones matrimoniales).

Ahora bien, así como las cuestiones relativas a la eficacia o la nulidad de los actos o contratos que afectan directamente a las personas se regulan por medio del

---

[35] A. Miaja de la Muela, <u>Derecho Internacional Privado</u>, 9na ed., Madrid, Ed. Atlas, 1982, Vol. 2, pág. 360.

[36] Art. 9 del Código Civil, 31 L.P.R.A. sec. 9.

estatuto personal (Art. 9), cuando nos enfrentamos a los asuntos relacionados **con los bienes** emerge el llamado **estatuto real**. A esos efectos, el Art. 10 del Código Civil dispone que "[l]os bienes muebles están sujetos a la ley de la nación del propietario; los bienes inmuebles, a las leyes del país en que están sitos".[37] Se desprende que, a diferencia del estatuto personal, el estatuto real establece claramente que todo lo referente a los bienes inmuebles se rige por las leyes del lugar donde estén ubicados, "independientemente del domicilio de sus dueños".[38] Es sólo cuando de bienes muebles se trata que corresponde aplicar la ley del domicilio del propietario.

En cuanto a este tema, es importante señalar que la incorporación del actual estatuto real como parte del conjunto de normas que rige en esta jurisdicción provino del concepto *lex rei sitae* según se concebía en los Estados Unidos. A esos efectos, en <u>Bracons v. Registrador de San Juan</u>, 24 D.P.R. 753, 757 (1917), esta Curia catalogó tal proceder como **la reforma más importante** del Título Preliminar del Código Civil, al citar con autoridad a la Comisión Codificadora de 1902 en el sentido de que:

> La reforma más importante hecha en el Título Preliminar del Código ha sido la relativa a restringir la doctrina de los estatutos personal y real, tomando en cuenta y **aplicando el principio general del derecho civil americano** de que los derechos respecto a los bienes inmuebles han de regularse **totalmente**, así en cuanto a la contratación como en cuanto

---

[37] Art. 10 del Código Civil, *supra*.

[38] <u>Zarelli v. Registrador</u>, 124 D.P.R. 543, 550 (1989).

a los derechos hereditarios, por la ley del país en que están sitos. (Énfasis suplido.)[39]

La razón de ser de la norma establecida en el estatuto real, según ha sido aplicada en los Estados Unidos, es descrita de la siguiente manera por el Prof. Raleigh C. Minor en su tratado sobre <u>Conflicto de las Leyes</u>:

> Cada Estado hace lo que está a su alcance con el fin de que sus leyes que afectan la entrega, traspaso y gravamen de bienes inmuebles situados dentro de sus límites sean lo más terminantes y precisas posibles. Se exigen formalidades especiales que no se requieren en otras cuestiones. Y es sumamente importante que las inscripciones legales de dichas transacciones, las cuales constituyen series de títulos a los bienes inmuebles, se conserven libres de toda censura, irregularidad o confusión con los requisitos de otros Estados.
>
> Por tanto, viene a ser especialmente parte de la política de todo Estado el no permitir que se verifique ninguna transacción relativa al traspaso de cualquier derecho o título a la propiedad inmueble que radica en dicho Estado si con ello se infringe su propia ley ya sea o no válida de acuerdo con la leyes de Estados extranjeros. [...]
>
> **Ni pretenderán las cortes de otros Estados hacer valer sus propias leyes relativas a los bienes inmuebles situados en otras partes, no solamente por espíritu de cortesía y su repugnancia a observar una conducta hacia otros Estados que no permitirán que estos últimos la observaran con ellos mismos, sino también y tal vez principalmente por la absoluta imposibilidad en que se encuentran para dictar cualquier sentencia o decreto que sea definitivo y eficaz para traspasar cualquier derecho sobre el inmueble.** Por tanto, en vez de dictar sentencias que son ociosas de conformidad con su misma ley, al considerar el título de los bienes inmuebles

---

[39] <u>Bracons v. Registrador de San Juan</u>, 24 D.P.R. 753, 757 (1917), citando el <u>Informe de la Comisión Codificadora del Código Civil de 1902</u>, presentado a la Asamblea Legislativa de Puerto Rico el 31 de diciembre de 1901.

radicados en países extranjeros, las cortes tratarán de fijar las reglas establecidas por la *lex situs* de dichos bienes, y resolverán de acuerdo con esa ley, pues a ella deben acudir las partes en definitiva en todo caso.

**Viene, pues, a ser un principio bien establecido de derecho internacional privado, sostenido por un fuerte núcleo de autoridades, que todas las cuestiones relativas a traspasos de títulos sobre bienes inmuebles donde quiera que surjan se regirán por la *lex situs*, o sea, por la ley del tribunal en que finalmente deban ser resueltas en definitiva esas cuestiones.** (Énfasis suplido.)[40]

Basándose en la explicación otorgada por la Comisión Codificadora que preparó el proyecto del Código Civil de 1902, respecto a la razón por la cual se incorporó el estatuto real en nuestro ordenamiento, y tras invocar la opinión de tratadistas estudiosos de la materia, esta Curia "trazó su línea de conducta con toda claridad, optando por aplicar a Puerto Rico íntegramente la teoría americana, esto es, que la *lex rei sitae* es la norma que debe seguirse al determinar la capacidad legal de las partes en transacciones sobre bienes inmuebles".[41]

De esta forma, toda cuestión relacionada a los bienes inmuebles se rige por el estatuto real, esto es, las leyes del lugar en que está sito son las que priman, sin importar el domicilio de su propietario. Un caso ilustrativo de ello es el precedente establecido en

---

[40] Según citado en <u>Colón et al. v. El Registrador</u>, 22 D.P.R. 369, 373-374 (1915).

[41] <u>Bracons v. Registrador de San Juan</u>, *supra*, pág. 757, interpretando lo resuelto en <u>Amadeo v. El Registrador</u>, 3 D.P.R. 141 (1903), y en <u>Colón et al. v. El Registrador</u>, *supra*, respecto a la capacidad de las partes en transacciones sobre bienes inmuebles.

*Babilonia v. Registrador*, 62 D.P.R. 688 (1943). En dicho caso, una puertorriqueña estableció su domicilio en el estado de Nueva York y luego contrajo nupcias en ese estado con un puertorriqueño que llevaba varios años domiciliado allí. Al poco tiempo, ambos regresaron a la Isla y posteriormente el marido abandonó a su esposa para regresar nuevamente al estado de Nueva York. Vigente el matrimonio, la esposa compró tres fincas en Aguadilla mediante una escritura en la que hizo constar que era una señora casada con domicilio en el mencionado municipio.

El Registrador de la Propiedad inscribió la escritura con el defecto subsanable de no haber acreditado que el dinero invertido en esa compra era privativo. Luego de transcurrir varios años desde la inscripción, la señora solicitó al Registrador de la Propiedad que subsanara el defecto. En particular, adujo que para la época en que se casó ambos tenían su domicilio en el estado de Nueva York, por lo que las leyes de dicho estado eran las que regían los bienes inmuebles adquiridos con posterioridad a su matrimonio. Por lo tanto, según argumentó la señora Babilonia, al no existir el régimen económico de la sociedad legal de bienes gananciales en Nueva York, entonces esos bienes inmuebles adquiridos por ella en matrimonio eran propiedad privativa suya.

Ante esas alegaciones, esta Curia dispuso que aun cuando el matrimonio no se contrajo sujeto al régimen de la sociedad legal de bienes gananciales, pues esa regla de

propiedad matrimonial no opera en el estado de Nueva York, **"en cuanto a bienes inmuebles adquiridos con posterioridad al matrimonio, no cabe duda de que el estatuto real, y no el personal, es el que rige"**. (Énfasis suplido).[42] De este modo, se concluyó que la celebración del matrimonio en el estado de Nueva York más el domicilio temporal en ese estado "no son suficientes para justificar tan radical abandono de nuestra regla local sobre derechos de propiedad".[43] Además, señalamos que "en vista del hecho de que el estatuto real es el que impera, no vemos qué efecto pueda tener el domicilio sobre la cuestión aquí envuelta, excepto a los fines … de probar que el dinero con el cual compró los bienes inmuebles en cuestión fue obtenido por ella mientras estaba domiciliada en Nueva York".[44]

Lo anterior se conforma íntegramente a la letra del citado Art. 10, esto es, los bienes muebles se rigen por las leyes del domicilio de su propietario, mientras que los bienes inmuebles están sujetos a las normas del lugar en que se encuentran. Además, esa doctrina pautada jurisprudencialmente es cónsona con lo establecido por el <u>Restatement of the Law, Second, Conflicts of Laws</u>, American Law Institute, 1971, Vol. 2, Sec. 234, el cual formula que el efecto que tendrá el matrimonio sobre los

---

[42] <u>Babilonia v. Registrador</u>, 62 D.P.R. 688, 690 (1943). Esta norma fue reiterada en <u>Pueblo v. Denis Rivera</u>, 98 D.P.R. 704, 714 (1970).

[43] <u>Babilonia v. Registrador</u>, *supra*, pág. 692.

[44] Íd., págs. 692-693.

bienes inmuebles adquiridos durante la vigencia del consorcio será determinado por el derecho que apliquen los tribunales donde esté ubicada la propiedad, el cual -tal como ha resuelto este Tribunal en reiteradas ocasiones- usualmente será el suyo.

Ahora bien, a pesar de que la letra clara del estatuto real había sido aplicada de forma consistente, en Toppel v. Toppel, 114 D.P.R. 775 (1983), esta Curia optó por variar la doctrina establecida. Al así hacerlo razonamos que, considerando que el Art. 10 de nuestro Código Civil encontraba su raíz y equivalente en el Código Civil español, y debido a que para ese tiempo en España no existía el divorcio, el estatuto real "no se diseñó para resolver los conflictos de leyes en la zona del régimen de los bienes matrimoniales".[45] Reexaminado ese razonamiento, nos percatamos de que éste fue errado.[46] Veamos.

Como reseñamos, desde Bracons v. Registrador de San Juan, *supra*, citando a la Comisión Codificadora del Código Civil de 1902, la reforma legislativa relativa al alcance del Art. 10 se había catalogado como la más importante del Título Preliminar del Código Civil. Esto, **al incorporarse el principio general del derecho estadounidense** respecto a que los bienes inmuebles se

---

[45] Toppel v. Toppel, 114 D.P.R. 775, 782 (1983).

[46] Como veremos más adelante, igual razonamiento tuvo la Asamblea Legislativa al enmendar el Art. 1277 del Código Civil, 31 L.P.R.A sec. 3561, y conservar la última oración de la mencionada disposición en lo referente al estatuto real. Véase la Ley Núm. 4 de 5 de marzo de 1987.

regulan totalmente por la ley del lugar en que estén sitos. Ante esa realidad y conforme a la clara intención del legislador, lo que correspondía entonces en Toppel v. Toppel, *supra*, era analizar el alcance que se le había otorgado a la figura de *lex rei sitae* en el derecho estadounidense.

De manera que, aunque el texto original del Art. 10 del Código Civil proviniera en un principio del Código Civil español, en Toppel v. Toppel, *supra*, debimos interpretar dicho artículo a la luz de la nueva realidad puertorriqueña que esbozara nuestra Asamblea Legislativa en el 1902. En ese sentido, por ser contrario al historial del Código Civil de Puerto Rico, consideramos desacertado haber modificado la doctrina consistentemente reiterada.[47]

Cónsono con lo anterior, en Zarelli v. Registrador, 124 D.P.R. 543 (1989), caso posterior a Toppel v. Toppel, *supra*, este Tribunal obvió la referida modificación al

---

[47] Al determinar en Toppel v. Toppel, *supra*, pág. 796, que el estatuto real no se activaba ante controversias dentro del régimen de los bienes matrimoniales, se dispuso que ello tenía la consecuencia de afectar

> el resultado o, a veces, el razonamiento tan sólo de algunas decisiones nuestras. Quedan afectadas especialmente las de Babilonia v. Registrador, 62 D.P.R. 688 (1943); Fenning v. Tribunal Superior, 96 D.P.R. 615 (1968); y Pueblo v. Denis Rivera, 98 D.P.R. 704 (1970). Se les revoca en cuanto sean incompatibles con esta opinión.

Ahora bien, en vista de que mediante la Opinión de autos se afecta el razonamiento de Toppel v. Toppel, *supra*, en lo relativo al alcance del Art. 10 del Código Civil, *supra*, dejamos sin efecto la revocación parcial de la jurisprudencia mencionada en Toppel v. Toppel, *supra*. Ello es similar a lo realizado por nuestra Legislatura, la cual -como se explica en la parte VI de esta Opinión- enmendó el Art. 1277 del Código Civil, 31 L.P.R.A. sec. 3561, devolviéndole al Art. 10 su vigencia dentro de la zona del régimen de bienes matrimoniales.

aplicar nuevamente el estatuto real para resolver una cuestión relacionada a la enajenación de bienes inmuebles gananciales, entiéndase, dentro de la zona del régimen de bienes gananciales. En específico, la controversia que se presentó fue si un poder general otorgado en los Estados Unidos por un cónyuge a favor de otro constituye el mandato expreso y requerido en Puerto Rico para la enajenación de bienes inmuebles gananciales. Al resolver que, a tenor con el Art. 10 del Código Civil, *supra*, la ley aplicable era la de Puerto Rico, expresamos que:

> Aun cuando la señora Salemi no estuviese domiciliada aquí y fuera solamente residente de la isla, el resultado sería el mismo. Tendríamos que aplicar las leyes locales porque el inmueble está sito aquí. El estatuto real aplica a todos los inmuebles sitos en la isla, independientemente del domicilio de sus dueños. De manera que no existe controversia alguna de que las leyes de Puerto Rico son las aplicables al considerar la disposición del referido inmueble.[48]

Desde esta perspectiva, como el Art. 10 del Código Civil, *supra*, incorporó el principio general del derecho estadounidense respecto a que los bienes inmuebles se regulan totalmente por la ley del lugar en que estén sitos, lo correcto entonces es identificar cómo ha sido su desarrollo en aquella jurisdicción. A manera de ejemplo, la figura *lex rei sitae* ha sido aplicada de la siguiente forma en los Estados Unidos de América, ello con influencia del derecho civil en cuanto a los efectos del matrimonio:

---

[48] Zarelli v. Registrador, 124 D.P.R. 543, 550 (1989).

> Marriage is a very personal matter, and its incidents are generally regulated by the law of the matrimonial domicile. But the Spanish and French laws touching community property, and those of California and Texas and other States derived from them, are held to be, in the vocabulary of the civilians, statutes real and not statutes personal: that is to say, they apply to things within a country's jurisdiction rather than to persons wherever they may be or go. It should follow that things, whether movable or immovable, actually situated in a State and effectively within its power, should be governed by the law of the State. It is universally held that real or immovable property is exclusively subject to the law of the country or State in which it is situated, and no interference with it by the law of any other sovereignty is permitted. And the question whether property is real or personal is to be solved by the law of the place where it is actually located. **These rules apply to questions of the marital rights of spouses in property**. (Énfasis suplido.)[49]

Como vemos, en el derecho estadounidense se le da gran énfasis al hecho de que la propiedad inmueble se rige única y exclusivamente por las leyes del estado en que esté sito el inmueble.  Ello evita que surjan conflictos entre estados hermanos en relación con la ley a aplicarse respecto a las propiedades inmuebles sitas en éstos. Además, propicia un ambiente de mutua deferencia respecto al dominio y la soberanía de éstos sobre el bien en cuestión, a la vez que promulga la aplicación uniforme de las leyes a todas las propiedades inmuebles dentro de un mismo territorio. A su vez, introduce un alto grado de previsibilidad, al mismo tiempo que refleja el control que el estado puede ejercer sobre los bienes que se encuentran

---

[49] <u>Commissioner of Internal Revenue v. Skaggs</u>, 122 F.2d 721, 723 (5to Cir., 1941), cert. denegado en <u>Skaggs v. Commissioner of Internal Revenue</u>, 315 U.S. 811 (1942).

en su territorio. Es claro que el estado en el que está ubicado el inmueble posee un interés particular sobre éste en vista de que precisamente esa propiedad es inamovible.

La confirmación de que esta visión es la que prevalece en el derecho estadounidense en materia de conflicto de leyes la provee el Restatement of the Law:

> Several factors serve to explain the importance attributed by the rule to the location of the land. The state where the land is situated will have a natural interest in transactions affecting it, particularly in view of the fact that land by its nature is immovable. Also, since in the situations covered by the rule the land constitutes the subject matter of the contract, it can often be assumed that the parties, to the extend that they thought about the matter at all, would expect that the local law of state where the land is situated would be applied to determine many of the issues arising under the contract. The rule furthers the choice-of-law values of certainty, predictability and uniformity of result and, since the state where the land is situated will be readily ascertainable, of ease in the determination of the applicable law.[50]

Incluso, como previamente hemos expuesto, ello es aplicable a las controversias surgidas respecto a los derechos propietarios de los cónyuges dentro de la zona del régimen económico matrimonial. Así se protegen las expectativas para las cuales los cónyuges contrataron a tenor con las leyes que rigen la propiedad inmueble en cuestión. Todo esto es consistente con lo establecido de manera reiterada por esta Curia, pues, como ha quedado demostrado, al enfrentarse a controversias sobre bienes

---

[50] Restatement of the Law, *op cit.*, Vol. 1, Sec. 189.

inmuebles sitos en Puerto Rico, las leyes de esta jurisdicción han primado consistentemente.

VI

En cuanto a las cuestiones de cambio de domicilio conyugal, nuestra Asamblea Legislativa dispuso en el Art. 1277 del Código Civil, 31 L.P.R.A sec. 3561, la norma aplicable al caso específico en que se contrae matrimonio en el extranjero y **sólo uno de los cónyuges es puertorriqueño**, pero los consortes no establecen el régimen económico que regirá su matrimonio con relación a sus bienes. Ante ese escenario, la Legislatura estableció que "se entenderá que se casan bajo el régimen de la ley del país en el cual los contratantes establezcan su domicilio conyugal, tomando en cuenta otros factores que en justicia deban considerarse, tales como conflicto móvil o centro de intereses conyugales, **todo sin perjuicio de lo establecido en este título respecto a los bienes inmuebles**". (Énfasis suplido.)[51]

La citada disposición estatutaria adopta los postulados establecidos por este Tribunal en <u>Toppel v. Toppel</u>, *supra*, respecto a los asuntos generados a partir de la situación conocida en el derecho internacional privado como conflicto móvil,[52] pero en su última parte le devuelve su plena eficacia al Art. 10 del Código Civil,

---

[51] Art. 1277 del Código Civil, *supra*.

[52] Este concepto constituye la norma de conflicto de leyes aplicable en controversias surgidas en la zona de bienes gananciales ante cambios en el domicilio conyugal o del centro de intereses del matrimonio.

*supra*, en cuestiones relacionadas con la zona del régimen económico matrimonial. Y es que la doctrina sobre el conflicto móvil o centro de intereses conyugales establecida en dicha decisión fue incorporada por el legislador en 1987 al enmendar el Art. 1277 del Código Civil, *supra*, pero ello "sin perjuicio de lo establecido [en el Art. 10] respecto a los bienes inmuebles".[53] Con esta última expresión, la Asamblea Legislativa rechazó directamente la interpretación que del Art. 10 del Código Civil, *supra*, se realizó en Toppel v. Toppel, *supra*, a los efectos de que el estatuto real "no se diseñó para resolver los conflictos de leyes en la zona del régimen de los bienes matrimoniales".[54] Ello implica, además, que para cuestiones como las de autos, el legislador rechazó la regla de unicidad patrimonial con excepción de la situación específica acaecida en Toppel v. Toppel, *supra*, esto es, matrimonios contraídos en el extranjero en los que ambos cónyuges sean extranjeros y se determine que el centro de intereses del matrimonio es en Puerto Rico, y si tanto los bienes muebles como los inmuebles están ubicados aquí.

Respecto a este particular, resulta muy atinado el análisis que realiza el ex Juez Asociado Raúl Serrano Geyls en su tratado Derecho de familia de Puerto Rico y legislación comparada:

---

[53] Art. 1277 del Código Civil, *supra*.

[54] Toppel v. Toppel, *supra*, pág. 782.

**La regla de la unicidad patrimonial, rechazada en el art. 1277 del C.C. al quedar expresamente vigente la aplicabilidad del art. 10 del mismo en cuanto a los bienes inmuebles, podría prevalecer sólo en los casos de matrimonios contraídos fuera de P.R. en los que ambos cónyuges sean extranjeros y se determine que el centro de intereses del matrimonio es P.R., y si, como en el caso *Toppel*, tanto los bienes muebles como los inmuebles están en P.R., al momento del divorcio. Sería imposible alcanzar con nuestra ley bienes extranjeros más allá de nuestras fronteras, salvo que el país concernido acepte la determinación de los tribunales puertorriqueños.**

Posiblemente la idea más innovadora adoptada en el art. 1277 del C.C. fue la de la mutabilidad limitada que permite, en casos donde no se hayan otorgado capitulaciones matrimoniales, un cambio de régimen económico luego de celebrado el matrimonio si se justificare el cambio a la luz de los criterios de *Toppel* y lo establecido en ese artículo. Este concepto de la mutabilidad limitada fue resultado de la doctrina de la voluntad presunta reconocida en el Derecho Internacional Privado. [...] Entendemos que este art. 1277, tanto antes de ser enmendado como luego de la enmienda vigente, no es de aplicación a matrimonios en que son extranjeros ambos cónyuges, en cuyo caso, como ya dijimos, habrá de regir lo resuelto en *Toppel* aplicando la regla de la unicidad patrimonial sólo en circunstancias idénticas a las que se dieron allí. **No obstante, como el nuevo art. 1277 reafirma el principio básico del art. 10 sobre bienes inmuebles, podría interpretarse que ello se aplica a todas las situaciones.** (Énfasis suplido.) [55]

Ciertamente, mediante el Art. 1277 del Código Civil, *supra*, el legislador puertorriqueño alteró dos principios comprendidos dentro de la zona del régimen de bienes gananciales: la unicidad patrimonial y la inmutabilidad del régimen económico matrimonial. En cuanto al primero, al reiterar la aplicación del Art. 10 del Código Civil,

---

[55] R. Serrano Geyls, op. cit., págs. 510-511.

*supra*, se provee para que los bienes inmuebles se rijan de acuerdo a las leyes del país en que estén sitos, al margen del régimen económico que rige la relación patrimonial de los consortes. De otro lado, la regla de inmutabilidad del régimen económico dejó de ser absoluta. Esto es, la Asamblea Legislativa adentró en nuestro ordenamiento la mutabilidad limitada en casos en los que no se hayan otorgado capitulaciones matrimoniales y sí se justifica su aplicación a tenor con los criterios establecidos en el Art. 1277 del Código Civil, *supra*, teniendo en cuenta los factores identificados en Toppel v. Toppel, *supra*. Ello, como consecuencia del reconocimiento por parte del legislador de la aplicación en Puerto Rico de la doctrina de la voluntad presunta, la cual -en palabras de la propia Legislatura- "reconoce la autonomía de un nacional para contratar sobre bienes con ocasión del matrimonio, conservando la libertad durante el curso de su vida para adquirir nuevo domicilio y adoptar sus costumbres, su forma de vida y sus prácticas de negocios, viniendo eventualmente por elección a ser sujeto de un estatuto personal distinto al que le dio su origen".[56]

VII

En Rojas, Randal & Co. v. El Registrador, 27 D.P.R. 21 (1919), citando a Colón et al. v. El Registrador, 22 D.P.R. 369 (1915), y a Bracons v. Registrador de San Juan, *supra*, establecimos que, conforme al estatuto real,

---

[56] Exposición de Motivos de la Ley Núm. 4 del 5 de marzo de 1987.

para decretar la validez de un contrato cuyo objeto sea un bien inmueble basta con identificar que se hayan cumplido los requisitos internos o esenciales -como la capacidad legal de las partes- dispuestos para esos convenios por las leyes del país en que esté sito el inmueble.

Es necesario, pues, distinguir entre lo que son los requisitos de fondo o intrínsecos y los requisitos formales. Las cuestiones de fondo son aquellas a las que nos hemos referido antes respecto a los requisitos internos o esenciales de los convenios sobre bienes inmuebles. Por otro lado, los requisitos formales de esos contratos están regidos por el estatuto formal, consagrado en el Art. 11 del Código Civil, *supra*. La regla establecida por el mencionado estatuto se le conoce como *locus regit actum* (el lugar rige el acto) o *lex loci actus* (la ley del lugar de los actos), la cual dispone "el principio de que en el otorgamiento de un acto o contrato en una jurisdicción extranjera las partes deben cumplir con todas las formas y solemnidades exigidas por las leyes de ese lugar".[57] La existencia de esta norma se debe a que es a ella que se recurre cuando surgen conflictos sobre contratos formales o solemnes, esto es, si la solemnidad requerida es la del foro extranjero o la del patrio.

Precisamente, en <u>Armstrong v. Armstrong</u>, 85 D.P.R. 404 (1962), este Tribunal se enfrentó a un testamento otorgado fuera de Puerto Rico acorde con las formas y

---

[57] <u>Vda. de Ruiz v. Registrador</u>, 93 D.P.R. 914, 921 (1967).

solemnidades del lugar en que se otorgó, pero con la particularidad de que mediante éste se transmitían derechos sobre bienes inmuebles sitos en esta jurisdicción. Como vemos, la controversia versó sobre requisitos formales del documento y no de fondo o intrínsecos, pues no se planteó que lo dispuesto en el testamento contravenía nuestro derecho sustantivo en materia de Sucesiones. Habiendo sido de exclusiva competencia el estatuto formal, esta Curia determinó que en Puerto Rico no es necesario que un testamento otorgado en el extranjero cumpla con los requisitos formales que exige nuestra ley aun cuando mediante ese testamento se transmitan derechos sobre bienes inmuebles sitos aquí.

Ahora bien, el estatuto formal, cuyas disposiciones son de naturaleza potestativa o discrecional, no imperativas o mandatorias,[58] contiene una disposición que, aunque nada tiene que ver con las formas, crea una regla excepcional. En específico, el Art. 11 del Código Civil, *supra*, establece lo siguiente:

> Las formas y solemnidades de los contratos, testamentos y demás instrumentos públicos, se rigen por las leyes del país en que se otorguen. [...]

> No obstante lo dispuesto en esta sección y en la anterior, las leyes prohibitivas concernientes a las personas, sus actos o sus bienes, y las que tienen por objeto el orden público y las buenas costumbres, no quedarán sin efecto por leyes o sentencias dictadas, ni por

---

[58] Vda. de Ruiz v. Registrador, *supra*, pág. 925.

disposiciones o convenciones acordadas en países extranjeros.[59]

Nótese que a pesar de que el estatuto formal sólo aplica a actos jurídicos en los que la forma es lo que importa, el legislador puertorriqueño optó por incluir en éste una norma limitativa de las actuaciones que realizan las personas en el extranjero.

## VIII

El caso de autos presenta una situación muy particular en la que se enfrentan dos disposiciones del Código Civil en materia de derecho internacional privado; una intentando sobreponerse a la otra al expresamente anular sus efectos ante actos prohibidos por nuestras leyes. En otras palabras, tenemos aquí la norma limitativa del estatuto formal (Art. 11 del Código Civil, *supra*) imponiéndose ante la sostenida figura de *lex rei sitae* del estatuto real (Art. 10 del Código Civil, *supra*). Ello a pesar del gran énfasis que esta última ha adquirido en el derecho estadounidense -de donde proviene- a los efectos de que la propiedad inmueble se rige única y exclusivamente por las leyes del estado donde está sita. Ello es reflejo del control que el estado puede ejercer sobre los bienes inamovibles que se encuentran en su territorio.

Queda claro que la transacción realizada entre la señora Rodríguez Cruz y el señor Roselló Puig, al

---

[59] Art. 11 del Código Civil, *supra*.

transferir a la primera la titularidad exclusiva del inmueble sito en el estado de Florida, a tenor con las leyes de ese estado, fue una actuación que en nuestra jurisdicción no podría efectuarse. Recuérdese que en Puerto Rico unos cónyuges sujetos al régimen de la sociedad legal de bienes gananciales no pueden contratar entre sí ni realizarse donaciones más allá de aquellas módicas en ocasión de regocijo familiar. Adquiere relevancia, entonces, la regla prohibitiva del Art. 11 del Código Civil, *supra*, la cual dicta que a pesar de lo que una ley de un país extranjero disponga, en Puerto Rico ello no tendrá efecto si aquí se prohíbe realizar tal acto. Lo anterior, ante situaciones como la presente, tiene el efecto de limitar el alcance de la reforma más importante hecha en el Título Preliminar del Código Civil en cuanto a "que los derechos respecto a los bienes inmuebles han de regularse **totalmente**, así en cuanto a la contratación como en cuanto a los derechos hereditarios, por la ley del país en que están sitos". (Énfasis suplido.)[60]

Ahora bien, el caso de autos presenta otro asunto muy particular. Específicamente se trata de la realidad de que el negocio jurídico del cual el inmueble en cuestión es objeto, se realizó, no en un país extranjero, sino en y conforme a las leyes de un estado de los Estados

---

[60] Bracons v. Registrador de San Juan, *supra*, pág. 757, citando el Informe de la Comisión Codificadora del Código Civil de 1902, presentado a la Asamblea Legislativa de Puerto Rico el 31 de diciembre de 1901.

Unidos de América, cuyo sistema federado integra a Puerto Rico como un componente de éste. Esta indudable realidad nos obliga a plantearnos si obviar la actuación de la peticionaria con el recurrido, realizada conforme a las leyes del estado de Florida, no es violatoria de la cláusula de entera fe y crédito del Art. IV, Sec. 1 de la Constitución de Estados Unidos, L.P.R.A., Tomo 1, que también rige en nuestra jurisdicción. Téngase en cuenta que estamos ante un conflicto de leyes entre dos jurisdicciones de un mismo sistema federal.

Las leyes de un estado de los Estados Unidos de América no son estatutos ajenos a nuestro ordenamiento jurídico. Todo lo contrario, en los Estados Unidos de América existen salvaguardas constitucionales que se extienden a Puerto Rico, como lo son las cláusulas de debido proceso de ley, y de entera fe y crédito, las cuales dan certeza de la justicia de las actuaciones oficiales dentro de cada uno de los estados.[61] Esas salvaguardas impiden que tratemos las leyes del estado de Florida como unas normas extrañas. Insistir en así hacerlo implicaría aislarnos de una comunidad jurídica de la que somos parte, abandonando de esa forma "la cohesión interna [que existe] entre las distintas jurisdicciones que interrelacionan en los Estados Unidos".[62]

---

[61] Restatement of the Law, op. cit., Vol. I, Sec. 10.

[62] Pueblo v. Martínez Cruz, 167 D.P.R. 741, 759 (2006).

De esta forma, en nuestro sistema federalista sería un contrasentido afirmar que una ley de un estado, por ser distinta a la nuestra (al permitir realizar una transacción respecto a un bien inmueble), es inaplicable en Puerto Rico. Nótese que la prohibición en cuestión no surge del estatuto personal (Art. 9 del Código Civil, *supra*), sino que al ser un asunto relativo a un bien inmueble entonces el estatuto real (Art. 10 del Código Civil, *supra*) es el que aplica, obligándonos así y de primera intención a implementar la ley concerniente al estado de Florida. No obstante, lo cierto es que chocamos con la regla excepcional del estatuto formal (Art. 11 del Código Civil, *supra*) que impide en este caso la aplicación del Art. 10 del Código Civil, *supra*, por ser la ley del estado de Florida distinta a nuestra ley.

Ahora bien, siendo las leyes del estado de Florida las que el Art. 11 del Código Civil, *supra*, nos obliga a obviar, éste provoca que al aplicar tal norma excepcional se entre en un claro conflicto con una disposición de la más alta jerarquía: la cláusula constitucional de entera fe y crédito. Sabido es que cuando único podemos apartarnos del cumplimiento con la cláusula constitucional federal de entera fe y crédito e ignorar lo que proveen las leyes de otro estado es cuando respetar la Ley Suprema federal implica darle entera fe y crédito a una ley que tiene el efecto de contrariar el orden público local, esto es, que esa ley estatal sea repugnante a los valores y a

la moral establecida en nuestra jurisdicción o que provoque disturbios o afecte la organización social, económica o política.[63] Ello en vista de que, como señalamos, no estamos ante una sentencia o ley de un país ajeno al nuestro, sino que estamos ante un estatuto de un estado de los Estados Unidos de América, al cual le debemos entera fe y crédito.

Como se expuso, la prohibición de contratación entre cónyuges vigente en nuestro ordenamiento se ha asociado con el principio de la inmutabilidad del régimen económico matrimonial, a la vez que responde "a la necesidad de evitar influencias, coacciones y abusos que el cónyuge más fuerte podría ejercer sobre el más débil".[64] Ante estas concepciones en las que se fundamenta la prohibición de contratación conyugal, nos corresponde identificar si apartarnos de esta limitación para darle entera fe y crédito a la ley del estado de Florida, obviando así la norma excepcional del estatuto formal, pero reconociendo todos los efectos de la figura *lex rei sitae*, conlleva alterar nuestro orden público.

Como ya hemos reconocido, esta inmutabilidad ha dejado de ser absoluta, pues -en reacción al dictamen de Toppel v. Toppel, *supra*- la Asamblea Legislativa enmendó el Art. 1277 del Código Civil, *supra*. Al así proceder, el legislador introdujo en nuestro ordenamiento jurídico la

---

[63] Véanse: Pacific Employers Insurance v. Industrial Accident Comm'n, 306 U.S. 493 (1939); Bond et al. v. Hume, 234 U.S. 15 (1917).

[64] Serrano Geyls, op. cit., pág. 317.

mutabilidad limitada del régimen económico matrimonial en casos en los que no se hayan otorgado capitulaciones matrimoniales y se justificase su aplicación al tomar en cuenta "factores que en justicia deban considerarse, tales como conflicto móvil o centro de intereses conyugales, todo sin perjuicio de lo establecido en [el Art. 10] respecto a los bienes inmuebles".[65]

Como es de notar, el propio legislador ha adentrado en nuestro ordenamiento la noción de la mutabilidad limitada del régimen económico matrimonial. De esta forma, resulta forzoso concluir que la inmutabilidad de este régimen no es una norma inquebrantable en Puerto Rico. En este sentido, su concepción tampoco puede ser catalogada como una cuestión arraigada y promulgadora del orden público local, ya que aquí se han preceptuado circunstancias en las que tal inmutabilidad es desatendida. En específico, el legislador, al aprobar la versión vigente del Art. 1277 del Código Civil, *supra*, ha determinado que la norma que establece que los bienes inmuebles se rigen por la ley del lugar en que están sitos funge como una excepción a la inmutabilidad del régimen económico matrimonial. A base de lo anterior, no albergamos duda alguna respecto a que el precepto que incorpora esa inmutabilidad –el Art. 1272 del Código

---

[65] Art. 1277 del Código Civil, *supra*. Mediante esta disposición estatutaria, la Legislatura también alteró el concepto de unicidad patrimonial, pues al reiterar la aplicación del estatuto real para resolver cuestiones dentro de la zona del régimen económico matrimonial, le otorgó primacía a la norma de que los bienes inmuebles se rigen de acuerdo a las leyes del lugar en que estén sitos, al margen del régimen patrimonial establecido por los consortes.

Civil- tampoco alcanza el rango necesario como para sobreponerse a la cláusula de entera fe y crédito.

Como puede notarse, tal como apuntaban los comentaristas españoles respecto a las donaciones mutuas entre los cónyuges cuando éstas estaban prohibidas en el Código Civil español,[66] esas prohibiciones no atentan contra el orden público local, por lo que pueden ser obviadas ante situaciones meritorias como la de autos. Más aun cuando respetar la ley del estado de Florida -a tenor con la cláusula de entera fe y crédito- a lo que nos conduce es precisamente a sobreponer nuestro estatuto real (Art. 10 de Código Civil, *supra*) que establece que prevalecerá la ley del sitio donde esté el inmueble, aunque dicha ley sea distinta a la puertorriqueña. Disposición que, al regir "totalmente" los asuntos relacionados con los bienes inmuebles, es aplicable a cuestiones surgidas dentro de la zona del régimen económico matrimonial.

En fin, como la propiedad está sita en el estado de Florida y las leyes de ese estado permiten que los cónyuges alcancen acuerdos o contraten sobre sus bienes, nos corresponde entonces otorgarle entera fe y crédito a esas leyes y así validar la transferencia de la titularidad exclusiva del bien inmueble a la señora Rodríguez Cruz.

IX

---

[66] Véase A. Marín López, op cit., pág. 539.

Ahora bien, a pesar de que resulta forzoso reconocer el carácter privativo de la propiedad sita en el estado de Florida, no debe perderse de vista que el Art. 10 del Código Civil, *supra*, también establece que los bienes muebles están sujetos a la ley del domicilio de su propietario. De esta forma, la cuestión de quién figura como dueño de la propiedad inmueble debe resolverse a tenor con las leyes del estado de Florida por éste poseer el mayor interés respecto a ese asunto; pero, de los cónyuges haber estado domiciliados en Puerto Rico, las leyes locales gobernarían el asunto concerniente al crédito que corresponda por el dinero utilizado para la adquisición y posterior pago de la deuda hipotecaria de ese inmueble.[67]  No obstante, en el supuesto de que haya sido en el estado de Florida donde constituyeron su domicilio conyugal, entonces las leyes de esa jurisdicción serían las aplicables respecto a ese particular.

Sin embargo, los autos no nos aclaran cuál era el domicilio de los cónyuges al momento de adquirir la propiedad inmueble y al posteriormente traspasarla a la señora Rodríguez Cruz, por lo que no tenemos los elementos de juicio necesarios para adjudicar ese asunto. En ese sentido, le asiste la razón a la peticionaria, la señora Rodríguez Cruz, al aducir en su alegato que erró el Tribunal de Apelaciones al concluir que los consortes estaban domiciliados en Puerto Rico. No encontramos

---

[67] Véase Babilonia v. Registrador, *supra*, págs. 692-693.

adjudicación alguna sobre el particular por parte del foro primario.

                              X

      Por los fundamentos antes expuestos, determinamos que mediante la escritura otorgada entre las partes en el estado de Florida el inmueble sito en ese estado pasó a ser un bien privativo de la peticionaria. Por lo tanto, se revoca la sentencia dictada por el Tribunal de Apelaciones y se devuelve el caso al Tribunal de Primera Instancia para que, luego de recibir prueba, adjudique cuál fue el domicilio conyugal de los exconsortes y, a tenor con las leyes de éste, adjudique la cuantía del crédito correspondiente.[68]

      Se dictará sentencia de conformidad.


                              Erick V. Kolthoff Caraballo
                              Juez Asociado

---

[68] Recuérdese que por un lado el señor Roselló Puig alegó que si bien la propiedad fue transferida a la señora Rodríguez Cruz durante la vigencia del matrimonio, él continuó realizando los pagos del préstamo hipotecario del inmueble hasta agosto de 2003 (posterior a decretado el divorcio), fecha en que la señora Rodríguez Cruz lo vendió. Por su parte, la señora Rodríguez Cruz adujo que "[l]as mensualidades de la hipoteca fueron satisfechas con bienes de la Sociedad Legal de Gananciales desde que la misma fue incurrida hasta aproximadamente el mes de agosto de 2003". Apéndice de la Petición de *certiorari*, pág. 80.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Carlos Roselló Puig

    Recurrido

      v.                CC-2006-1031     Certiorari

Ruth N. Rodríguez Cruz

    Peticionaria

SENTENCIA

San Juan, Puerto Rico, a 11 de octubre de 2011.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se revoca la sentencia dictada por el Tribunal de Apelaciones y se devuelve el caso al Tribunal de Primera Instancia para que, luego de recibir prueba, adjudique cuál fue el domicilio conyugal de los exconsortes y, a tenor con las leyes de éste, adjudique la cuantía del crédito correspondiente

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Jueza Asociada señora Fiol Matta emitió Opinión Disidente a la cual se une el Juez Presidente señor Hernández Denton. La Juez Asociada señora Rodríguez Rodríguez emitió Opinión Disidente. El Juez Asociado señor Martínez Torres está inhibido.

                      Aida Ileana Oquendo Graulau
                      Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Carlos Roselló Puig
    Recurrido

                                      *Certiorari*

      v.                   CC-2006-1031

Ruth N. Rodríguez Cruz
    Peticionaria

Opinión Disidente emitida por la Jueza Asociada señora Fiol Matta a la cual se une el Juez Presidente señor Hernández Denton

En San Juan, Puerto Rico, a 11 de octubre de 2011.

Disiento del análisis de la mayoría de este Tribunal cuyo efecto es darle preeminencia, injustificadamente, a las disposiciones legales de otra jurisdicción, ignorando las normas vigentes en la nuestra. Este caso nos requiere decidir qué implicación tiene, para propósitos de una división de bienes posdivorcio realizada en Puerto Rico, el que las partes, mientras estaban casadas bajo el régimen de sociedad de gananciales de Puerto Rico, hubiesen suscrito un contrato permitido por las leyes del estado de Florida para transferir a título privativo de la esposa un bien inmueble sito en ese estado, adquirido por la pareja

durante el matrimonio.[69] La respuesta que brinda la Opinión mayoritaria es que debemos subordinar la normativa puertorriqueña, que prohíbe la contratación y donación entre cónyuges y dispone la inmutabilidad del régimen matrimonial, a la de Florida porque la Constitución de Estados Unidos así lo ordena. Esta solución es errónea tanto conforme a nuestro ordenamiento como al de Estados Unidos.

I

La Constitución de Estados Unidos establece que "[s]e dará entera fe y crédito en cada estado a los actos públicos, documentos y procedimientos judiciales de los otros estados".[70] Esta disposición constitucional, conocida como la de "full faith and credit", no cuenta con estatutos que ayuden a descifrar su alcance o estandarizar su aplicación. No obstante, el Tribunal Supremo de Estados Unidos ha establecido que no se trata de un mandato inexorable. Asimismo, ha reconocido que la disposición aplica tanto a las sentencias judiciales como a las leyes de los diferentes estados y territorios de Estados Unidos, pero no de la misma manera.[71]

---

[69] Por no haber controversia en cuanto a los hechos reseñados en la Opinión mayoritaria, no los expondremos nuevamente.

[70] Art. IV, Sec. 1, Const. E.E. U.U (Traducción, 1 L.P.R.A., ed. 2008, pág. 177).

[71] R.H. Jackson, Full Faith and Credit: The Lawyer's Clause of the Constitution, New York, Columbia University Press,

Los factores para determinar si un estado o territorio está obligado a emplear las leyes y regulaciones de otro por razón de la cláusula de entera fe y crédito difieren sustancialmente de las que debe considerar un tribunal para decidir si hace valer las sentencias dictadas en otra jurisdicción. Esto se debe a que cada estado o territorio tiene legitimidad para implementar la política pública que entienda más apropiada, a través de sus propias leyes.[72] Esa potestad es parte de la esencia de los sistemas federalistas, cuyos componentes ceden el control sobre ciertos asuntos pero conservan autonomía sobre muchos otros. En palabras del Tribunal Supremo de Estados Unidos:

> La naturaleza misma de una unión federal de estados, en la que cada uno de éstos mantiene su derecho soberano para promulgar sus propias leyes, impide recurrir a la Constitución como medio para compeler a un estado a subordinar por completo sus leyes y políticas concernientes a sus asuntos domésticos peculiares a las leyes y políticas de otros estados.[73]

---

1945, págs. 10-28. El Tribunal Supremo de Puerto Rico también ha explicado que la cláusula de *full faith and credit* no opera *ex proprio vigore* y está sujeta a excepciones, por lo que, en el contexto de las sentencias judiciales, no se le puede dar entera fe y crédito a una sentencia de otro estado, haciendo caso omiso de las leyes puertorriqueñas que exigen la intervención previa de un tribunal local. Amy v. Adm. Deporte Hípico, 116 D.P.R. 414, 420 (1985); Roseberry v. Registrador, 114 D.P.R. 743, 747 (1983).

[72] W.J. Rich, Modern Constitutional Law, 3ra ed., Minnesota, Ed. West, 2011, Vol. 3, pág. 139.

[73] (Traducción nuestra.) Pink v. A.A.A. Highway Exp., 314 U.S. 201, 210 (1941). La versión original en inglés lee: "[T]he very nature of the federal union of states, to each of which is reserved the sovereign right to make its own laws, precludes resort to the Constitution as the means for

El estado foro, aquel donde se está atendiendo el caso, no tiene que subordinar automáticamente su ley a la de otra jurisdicción también aplicable a la controversia, sino que tiene la oportunidad de escoger, entre las dos políticas estatales conflictivas, la que es más adecuada para atender el caso. Además, no se le puede exigir a un estado o territorio aplicar la ley de otra jurisdicción cuando ésta se oponga a la moral o los principios básicos del foro.[74] La clave para la selección se encuentra en determinar, por un lado, si aplicar la ley del foro constituiría un acto arbitrario y, por el otro, si la ley extranjera es contraria al orden público del foro. El estado foro, entonces, tiene que decidir si los intereses por los que vela su ley tienen mayor peso que los del foro alternativo, y para ello debe considerar el respeto que merece la ley del otro, si las partes están debidamente informadas sobre la ley que se pretende aplicar y los contactos de cada estado con las partes y la controversia.[75] Si el foro tiene contactos significativos con la controversia, de modo que exista un interés del estado o territorio en el pleito, puede aplicar su propia ley, y más

_____

compelling one state wholly to subordinate its own laws and policy concerning its peculiarly domestic affairs to the laws and policy of others".

[74] Hughes v. Fetter, 341 U.S. 609, 611-612 (1951).

[75] Rich, *op. cit.*, pág. 140.

aun cuando la ley conflictiva de la otra jurisdicción va en contra de su política pública.[76]

La cláusula de entera fe y crédito presenta serias dificultades como vehículo de unificación de los diversos sistemas legales estatales de Estados Unidos, pues su lenguaje y su historia demuestran que no se diseñó para resolver disputas sobre la ley estatal aplicable, y el texto no le prohíbe a los estados y territorios aplicar sus propias leyes en casos de conflicto si tienen bases legítimas para hacerlo.[77] Asimismo, los estudiosos estadounidenses concuerdan en que la Constitución federal no provee guías adecuadas para seleccionar la ley estatal más apropiada para la resolución de cada controversia ni el Congreso ha legislado con claridad al respecto, por lo que es necesario recurrir a las normas de conflicto de leyes para hacer dicha determinación.[78]

---

[76] *Véase* <u>Philips Petroleum Co. v. Shutts</u>, 472 U.S. 797, 821-822 (1985).

[77] A.T. Von Mehren & D.T. Trautman, <u>The Law of Multistate Problems</u>, Boston, Ed. Little, Brown and Co., 1965, págs. 1243-1244. Inicialmente, esta cláusula estaba pensada para que las sentencias de las cortes de los estados y las deudas contributivas en virtud de leyes sobre impuestos estatales se pudieran hacer valer en otras jurisdicciones. *Id.* págs. 1229-1230. Estos autores también señalan que pensar en uniformidad jurídica, especialmente en temas "domésticos", dentro de un sistema federalista es imposible, pues cada estado tiene la libertad de establecer su propia política pública. *Id.* pág. 299.

[78] *Id.* pág. 1242; Rich, *op. cit.*, pág. 143.

Para propósitos de las doctrinas de conflicto de leyes, se consideran extranjeras las jurisdicciones que tienen legislación propia sobre ciertas materias que pueda ser incompatible con la del foro. Así, al interior de sistemas federales, donde coexisten diversas legislaciones estatales, como en Estados Unidos, se dan colisiones entre cuerpos de ley extranjeros. Lo mismo sucede en sistemas unitarios con legislaciones forales, como España.[79] Como señala el académico Kurt Nadelmann, en referencia a cómo se han atendido los conflictos de leyes dentro de Estados Unidos, los problemas de selección de ley aplicable no son más fáciles de resolver porque surjan en una unión federal.[80] Y es que este tipo de casos no se puede resolver diciendo simplemente que se le va a dar deferencia a un estado por estimarlo "hermano" y se va a aplicar su ley en lugar de la propia.[81]

La doctrina constitucional estadounidense indica que no es razonable esperar que siempre que haya un conflicto de leyes se le dé deferencia a la legislación del otro estado, y la jurisprudencia federal más reciente permite a los estados y territorios aplicar sus leyes y políticas

---

[79] Armstrong v. Armstrong, 85 D.P.R. 404, 409 (1962).

[80] "[C]hoice of law problems are not easier to solve if they arise in a federal union". K.H. Nadelmann, Conflict of Laws: International and Interstate, The Hague, Ed. Martinus Nijhoff, 1972, pág. 213.

[81] Véase Roselló Puig. v. Rodríguez Cruz, Opinión mayoritaria, págs. 35-38.

siempre que tengan interés en la disputa y una base racional para preferir sus normas.[82] En el presente caso, no se trata de rechazar la ley de Florida solamente porque es distinta a la nuestra,[83] sino porque el estatuto de ese estado que podría aplicar a la controversia contraviene la política pública vigente en Puerto Rico.

## II

*A.* El matrimonio y el régimen de bienes matrimoniales siempre han representado áreas de trabajo complejas para el Derecho Internacional Privado, por la importancia social de dicha institución, que está concebida para ser permanente mas puede disolverse en cualquier momento. Los innumerables cambios que puede experimentar el matrimonio en un mundo donde cada estado lo regula de modos diferentes y cada día hay mayor movilidad dan lugar a conflictos de leyes internacionales e interestatales que no se han atendido de manera uniforme.[84] Más bien, la trascendencia de las situaciones que involucran bienes matrimoniales y el interés de que cualquier división se lleve a cabo de manera que resulte justa y satisfactoria para la vida posterior de

---

[82] Rich, *op. cit.*, págs. 140-141.

[83] *Véase* Opinión mayoritaria, pág. 36.

[84] *Véase* J.M. de Lasala Samper, El régimen matrimonial de bienes. Derecho Internacional Privado e Interregional, Barcelona, Ed. Bosch, 1954, págs. 19-24. *Véanse también* L. Pålsson, Marriage and Divorce in Comparative Conflict of Laws, Leiden, Ed. A.W. Sijthoff, 1974; A. Miaja de la Muela, Derecho Internacional Privado, 9na ed., Madrid, Ed. Atlas, 1982, Tomo 2, págs. 357-376.

los ex cónyuges obligan a desarrollar diferentes políticas de selección de ley aplicable (*choice of law*) de acuerdo con las diversas circunstancias que se enfrentan.[85]

No obstante lo anterior, a medida que se ha estudiado el conflicto de leyes en el matrimonio, los tribunales y los tratadistas han coincidido en que es necesaria la unicidad. Esto es, seleccionar un cuerpo de leyes que sirva como única referencia para resolver todas las controversias sobre la participación de los esposos en las propiedades que poseen.[86] En su tratado sobre distribución equitativa, Turner indica que la práctica mayoritaria en Estados Unidos de dividir todos los bienes posdivorcio según una sola ley, que suele ser la ley del foro, es la mejor política; primero, por la razón práctica de que facilita la función judicial al no obligar a los tribunales a estudiar las leyes de otros estados y a recibir prueba para clasificar cada activo de forma individual, y, segundo, porque cada estado tiene su conjunto de políticas sobre Derecho de Familia y al aplicar de manera fragmentada las leyes de distintos estados se puede llegar a resultados incongruentes o injustos.[87]

---

[85] E.F. Scoles & P. Hay, Conflict of Laws, 2da ed., Minnesota, Ed. West, 1992, pág. 433.

[86] *Id.* pág. 469. *Véase también* R.A. Leflar, American Conflicts Law, 3ra ed., Indianapolis, Ed. Bobbs-Merrill Company, 1977, pág. 471.

[87] B.R. Turner, Equitable Distribution of Property, 3ra ed., Minnesota, Ed. Thomson West, 2005, Vol. 1, págs. 161-162.

El sistema para gobernar los bienes matrimoniales en Estados Unidos se divide en dos grandes categorías: los estados en que se utilizan las doctrinas del *common law* y los estados con ordenamientos de origen civilista (*community property states*). Dentro de esos dos grupos, cada estado tiene sus propias reglas sobre clasificación y división posdivorcio. El sistema de Florida es uno de los del primer grupo, mientras que el de Puerto Rico es similar al de los estados del segundo grupo.

Los conflictos de leyes en Estados Unidos surgen principalmente cuando se tienen que dividir los bienes luego del divorcio y la pareja posee muebles e inmuebles en distintos estados, unos con régimen de *common law* y otros en los que imperan normas de *community property*. La mayor incompatibilidad se da cuando la pareja ha estado domiciliada en distintos estados y tiene que dividir bienes sitos en una jurisdicción de *common law* dentro de un procedimiento que se lleva a cabo en un *community property state* o vicecersa.[88]

La selección de la norma que regirá la división es esencial porque en los *community property states* existe una presunción de que todos los bienes adquiridos durante el

---

[88] Hablamos de la mayor incompatibilidad, pues, dado que ni siquiera hay uniformidad en las leyes de los estados que están dentro de una misma categoría –*common law* o *community property states*–, siempre surgen conflictos de leyes, mas, si ambos estados utilizan sistemas similares de división, se pueden armonizar los estatutos con mayor facilidad.

matrimonio pertenecen por partes iguales a ambos cónyuges, a menos que establezcan un régimen distinto al casarse, y esa norma gobierna tanto durante el matrimonio como en la división posdivorcio. Mientras, en los *common law states* no opera esta presunción y la propiedad pertenece al cónyuge que la haya adquirido durante el matrimonio, por lo que todos los bienes podrían pertenecerle a una sola persona. La mayor parte de estos estados recurre entonces a la distribución equitativa para resolver el problema de que el cónyuge que no posee bienes de forma separada al momento del divorcio se quede sin medios para subsistir. De esta forma, los bienes de ambos ex cónyuges se asignan entre ellos de acuerdo a sus circunstancias particulares, sin depender necesariamente del título legal sobre las cosas ni repartirlas en partes iguales.[89]

Sin embargo, esa propiedad separada característica de una jurisdicción de *common law* se consideraría privativa de su dueño en un estado regido por las normas de *community property;* en ese caso, no habrían bienes gananciales que dividir. Para atender este problema, de manera que el cónyuge que no tiene propiedades a su nombre no quede desprovisto, las normas de conflicto de leyes sugieren clasificar las propiedades adquiridas fuera del *community property state* como si se hubiesen adquirido en éste. Así, un inmueble recibido por algún miembro de la pareja durante

---

[89] Turner, *op. cit.*, Vol. 1, págs. 2-3.

el matrimonio se reputaría matrimonial, siempre que no pudiera considerarse privativo como lo sería una herencia.[90] Esta clasificación para efectos de división se conoce como cuasi-comunidad.[91] En la situación contraria, cuando la propiedad ganancial o privativa situada en un *community property state* se va a dividir en uno de *common law*, afloran problemas para la clasificación, pues los bienes no pueden convertirse automáticamente en matrimoniales o separados, ya que las características de las categorías no son iguales en ambos sistemas. Para evitar incongruencias, todos los bienes se dividen según un solo sistema.[92] Es decir, se utiliza la unicidad del patrimonio y se selecciona una sola ley para la división.

La práctica generalizada en los últimos años en Estados Unidos, tanto en estados con régimen de *common law* como en los de *community property*, ha sido la de aplicar a todas las propiedades las normas del foro, en lugar de las de estados extranjeros. En los *common law states*, se han aplicado las leyes locales para la clasificación y distribución equitativa, ya sea por una política de que los estatutos propios son los que reglamentan ese tipo de casos

---

[90] Sobre bienes privativos en Puerto Rico, véase: Art. 1299, Cód. Civ. PR, 31 L.P.R.A. sec. 3631.

[91] Scoles, *op. cit.*, págs. 487-489; H. Marsh, Marital Property in Conflict of Laws, Seattle, University of Washington Press, 1952, págs. 234-235, 247.

[92] Marsh, *op. cit.*, pág. 100.

o porque, como suele determinarse, el foro es el estado con mayor relación significativa con la controversia. Asimismo, en la mayor parte de los *community property states*, se ha legislado para que el foro aplique su ley de división y clasifique los bienes ubicados en otros estados según la normativa de cuasi-comunidad.[93]

Esta práctica es congruente con las expresiones del Tribunal Supremo de Estados Unidos sobre los límites de la cláusula de entera fe y crédito: tratándose de asuntos sobre los cuales un estado o territorio puede legislar, no se puede le compeler a sustituir sus estatutos por los de otra jurisdicción, a menos que los intereses que defiende la otra jurisdicción sean superiores a los del foro.[94] En esa situación, el peso de probar que, debido al conflicto de leyes, el estado foro no debe hacer valer sus propios estatutos en sus propios tribunales recae en la parte que alega que la otra jurisdicción tiene valores más

---

[93] Turner, *op. cit.*, Vol. 1, págs. 158-161. Por ejemplo, en Louisiana, enmendaron las disposiciones del Código Civil que atienden los conflictos de leyes en casos de división de bienes entre los cónyuges para establecer que los inmuebles en Louisiana adquiridos por los esposos se rigen por las leyes de Louisiana, mientras que los inmuebles ubicados fuera de ese estado y adquiridos por alguno de los esposos durante el matrimonio, si mantenía domicilio en Louisiana, también se rigen por las leyes de Louisiana a los fines de determinar el derecho de cada cónyuge al valor del inmueble al disolverse la comunidad posdivorcio. La. C.C. arts. 3524-3525.

[94] Franchise Tax Board of California v. Hyatt, 538 U.S. 488, 494-497 (2003); Pacific Employers Ins. Co. v. Industrial Accident Commission of California, 306 U.S. 493, 501-503 (1939).

importantes que proteger.[95] De no hacerlo, prevalece la ley del foro. En casos en que ambos estados proveen guías para proteger a los ex cónyuges y sus intereses económicos de la manera que entienden más justa, los fundamentos que acoge un foro no podrían ir por encima de los del otro. Por eso, en la doctrina de conflicto de leyes, de manera similar a lo que sucede en la de entera fe y crédito, una política apremiante del foro a favor de su ley sustantiva sobre matrimonio se impondría sobre la del otro estado que compite por reconocimiento.[96]

*B.* Independientemente del método de división seleccionado, antes de distribuir los bienes que corresponden a cada ex cónyuge es necesario clasificar los bienes como privativos y gananciales, si se catalogan según la doctrina de *community property*, o como separados y matrimoniales, si se realiza la distribución equitativa de los estados de *common law*.

Esta distribución equitativa se lleva a cabo en tres pasos: la clasificación, en la cual se determina la masa divisible; la valoración y la división. Para hacer la clasificación, se identifican todos los activos que sean propiedad de cada uno de los ex cónyuges o de ambos, y luego se determina si esos bienes son matrimoniales o

---

[95] Rich, *op. cit.*, pág. 141.

[96] Marsh, *op. cit.*, págs. 114-117.

separados.[97] Los bienes separados se le asignan a su dueño o dueña y para que se decida otorgarle parte de éstos al otro cónyuge se exige necesidad económica con un estándar difícil de cumplir.[98] La parte interesada en que un bien se considere matrimonial tiene que probar que éste se adquirió, por uno de los cónyuges o ambos, durante el matrimonio. Entonces, el activo se presumirá matrimonial y quien se oponga a ello deberá probar que es separado.[99] Aunque tener el título legal sobre una propiedad no garantiza que ésta se le va a adjudicar finalmente al titular, el bien se clasifica como separado del cónyuge que tenga el título. El otro cónyuge puede demostrar que, por las aportaciones que hizo para la compra del bien o por otras razones, éste debe clasificarse como matrimonial y dividirse de forma equitativa.[100] El título legal también es importante cuando terceras personas son dueñas de los bienes junto a los esposos o los han adquirido de ellos, porque se protege su interés económico sobre la propiedad.[101]

---

[97] Turner, *op. cit.*, Vol. 1, págs. 158, 251-253. A pesar de que la distribución no se centra en el título sobre las cosas, es importante la clasificación para determinar qué bienes formarán parte de la masa matrimonial que se dividirá.

[98] *Id.* Vol. 2, págs. 940-944.

[99] *Id.* Vol. 1, págs. 255-256.

[100] *Id.* págs. 264-265.

[101] *Id.* pág. 164.

En Puerto Rico, como en otras jurisdicciones donde el régimen matrimonial supletorio es la sociedad de bienes gananciales, se presumen gananciales todos los bienes adquiridos por cualquiera de los cónyuges, a título oneroso, por sus esfuerzos o por los frutos que produzcan otros bienes, desde la celebración del matrimonio hasta su disolución.[102] Este es el régimen que aplica a todas las parejas que se casan en Puerto Rico, a menos que antes del matrimonio establezcan capitulaciones matrimoniales en las que seleccionen otro régimen para regir su propiedad.[103] En cualquiera de las dos instancias, el régimen seleccionado antes de establecerse el vínculo matrimonial es inmutable: no se puede cambiar mientras dure el matrimonio.[104]

Cuando se disuelve la sociedad de gananciales y nace la comunidad de bienes posdivorcio, los bienes gananciales forman una masa cuyos dueños, en común pro indiviso, son ambos ex esposos. Para dividir la comunidad, se hace un inventario de los bienes que pertenecen a los cónyuges y se clasifican como privativos o gananciales. Los privativos permanecerán en manos de su dueño o dueña, mientras que los gananciales se dividirán en partes iguales, a menos que se

---

[102] Arts. 1301 y 1307, Cód. Civ. PR, 31 L.P.R.A. secs. 3641 y 3647.

[103] Maldonado v. Cruz, 161 D.P.R. 1, 15-19 (2004).

[104] Art. 1272, Cód. Civ. PR, 31 L.P.R.A. sec. 3556.

demuestre que la proporción justa para la distribución de un bien es otra.[105]

### III

*A.* En el proceso de clasificación de los bienes posdivorcio, los tribunales se encuentran en la encrucijada de cómo catalogar los inmuebles que se encuentran fuera del foro: según la ley local o la del lugar en que ubica el bien. El artículo 10 del Código Civil de Puerto Rico indica que "[l]os bienes muebles están sujetos a la ley de la nación del propietario; los bienes inmuebles a las leyes del país en que están sitos".[106] Sin embargo, como veremos, esta disposición no aplica automáticamente a todos los inmuebles, pues se deben sopesar cuestiones de conflicto de leyes y razones de orden público antes de decidir qué ley regirá la controversia relacionada con un inmueble.

En la jurisprudencia puertorriqueña, encontramos variadas situaciones en las que se ha aplicado la ley de Puerto Rico por ser la del lugar donde está radicado el inmueble. Por ejemplo, en *Babilonia v. Registrador*, a una mujer casada en Nueva York, pero domiciliada en Puerto Rico, no se le permitió inscribir tres fincas ubicadas en Puerto Rico como bienes privativos, pues se aplicó la presunción de gananciales que dispone la ley de Puerto

---

[105] Montalván v. Rodríguez, 161 D.P.R. 411 (2004).

[106] 31 L.P.R.A. sec. 10.

Rico, donde se encontraban los inmuebles.[107] De igual forma, en *Pueblo v. Denis Rivera*, se decidió que regía la ley de Puerto Rico para clasificar como ganancial una casa ubicada en Puerto Rico que compró un hombre casado en Nueva York que luego se mudó a la Isla, aunque el régimen matrimonial por regla general en Nueva York no fuera la sociedad de gananciales.[108]

Sin embargo, debemos hacer una distinción importante de esos casos y otros similares respecto al presente. En todos aquéllos, los inmuebles en controversia se encontraban en Puerto Rico, por lo que, al decidir que aplicarían la ley del lugar donde el bien estaba sito, se estaba aplicando la ley del foro. No hubiese sido tan sencilla la selección de la ley del sitio si estas personas, con relaciones significativas con Puerto Rico, hubiesen tenido controversias relacionadas con bienes ubicados fuera de la Isla y que involucraran choques con otras disposiciones de orden público del País.

No se pueden usar esos precedentes para concluir que el artículo 10 aplica a todo tipo de controversia y que, cuando éste no se ha empleado, el Tribunal ha errado en su razonamiento.[109] Como bien explica la Opinión disidente de la juez asociada Rodríguez Rodríguez, cuando se enmendó

---

[107] 62 D.P.R. 688 (1943).

[108] 98 D.P.R. 704 (1970).

[109] *Véase* Opinión mayoritaria, pág. 23.

este estatuto real en el Código Civil, en 1902, se hizo únicamente para eliminar la norma de que las sucesiones se regirían por el estatuto personal y no para establecer que toda controversia relacionada con inmuebles se atendería según la ley de donde éstos se encontraran.[110] El caso *Bracons v. Registrador*, resuelto pocos años después, explica esta supresión al hablar de la "reforma importante" que se le hizo al Código Civil y utiliza la palabra "totalmente" para expresar que el estatuto real regiría desde entonces no sólo a los derechos sobre bienes inmuebles en casos de Contratos, sino también en casos de Sucesiones.[111]

Asimismo, no es posible basarse en un comentario que se hizo cuando se enmendó el Código Civil en 1902 para colegir que la norma vigente en Estados Unidos, y que debe aplicar en Puerto Rico, es la de la ley del sitio. La realidad actual dista mucho de esa aseveración. En Estados Unidos, la regla general tradicional de que los inmuebles se rigen por las normas del lugar en que están localizados ha sido descartada para casos de división de bienes posdivorcio en la mayor parte de los estados.[112] La norma

---

[110] *Véase* Roselló Puig. v. Rodríguez Cruz, Opinión disidente de la juez Rodríguez Rodríguez, pág. 19.

[111] 24 D.P.R. 753, 757 (1917). *Véase* Opinión mayoritaria, pág. 19.

[112] Turner, *op. cit.*, Vol. 1 pág. 158; Scoles, *op. cit.*, pág. 469.

del *situs* se ha dejado de utilizar por ser insuficiente para una solución adecuada de las controversias. Desde hace varias décadas, se ha estado empleando la norma de la fuente de origen, mediante la cual el interés matrimonial sobre un inmueble no cambia porque haya sido adquirido por un solo cónyuge como propiedad separada en un *common law state*, si se demuestra que el dinero que se utilizó para comprar la propiedad le pertenecía a la pareja o era un bien ganancial en el *community property state* donde el matrimonio estaba domiciliado anteriormente.[113] Más recientemente, se está aplicando la ley del foro que atiende el caso y la referencia al *situs* del inmueble sólo se utiliza para saber si el tribunal, luego de realizar la división, puede ordenar la transferencia automática del título sobre el bien al cónyuge al que se le asignó o debe ordenarle a la parte que haga los trámites en el registro de propiedades de la otra jurisdicción.[114]

*B.* Cuando se resolvió *Toppel v. Toppel*, en 1983, la "nueva realidad puertorriqueña" no era la que la Opinión mayoritaria identifica, a raíz de las discusiones

---

[113] Scoles, *op. cit.*, pág. 472-473; Marsh, *op. cit.*, pág. 102. El Restatement of the Law incluye esta regla como límite a la aplicación de la ley del *situs* en el primer comentario a la disposición sobre los efectos del matrimonio en el interés sobre tierras adquiridas luego del casamiento. American Law Institute, <u>Restatement of the Law Second – Conflicts of Laws 2d</u>, Minnesota, American Law Institute Publishers, 1971, Vol. 2, sec. 234, pág. 37.

[114] Turner, *op. cit.*, Vol. 1 pág. 160; Vol. 3, págs. 21-22.

legislativas de 1902 sobre la aplicación del estatuto real a todo tipo de controversia referente a inmuebles, sino la que la Constitución de Puerto Rico estableció en 1952 y diversas leyes aprobadas entre 1975 y 1976 reforzaron: la igualdad de derechos entre los hombres y las mujeres.[115] Por eso, es sumamente preocupante la revocación parcial innecesaria de *Toppel* que, sin mayor análisis, propone la decisión mayoritaria.[116] En *Toppel*, se interpretaron las normas de conflicto de leyes de modo que no violentaran la política pública puertorriqueña de equiparar los derechos de la esposa a los del marido. Se utilizaron las teorías más innovadoras en ese momento para proveer guías para la resolución de casos futuros de choques entre jurisdicciones por controversias sobre bienes matrimoniales y se dejó la puerta abierta para estudiar cada caso según las circunstancias particulares que presentara, mas siempre teniendo como máxima la sólida política pública de nuestro foro de igualdad entre los géneros. Si *Toppel* se hubiese resuelto aplicando rígidamente las normas de conflicto de leyes que establece el Código Civil y otras leyes que los foros inferiores entendían que aplicaban en aquel momento, la señora Toppel hubiese recibido una minúscula parte del

---

[115] <u>Toppel v. Toppel</u>, 114 D.P.R. 775, 793-795 (1983). Este caso se resolvió en equidad, pues las leyes existentes eran insuficientes para una solución razonable. Art. 7, Cód. Civ. PR, 31 L.P.R.A. sec. 7.

[116] *Véase* Opinión mayoritaria, págs. 23-26.

patrimonio que forjó junto a su esposo durante los años en que manejaron un negocio exitoso en Puerto Rico. Esa solución hubiese estado muy lejos de los principios que orientaban a los tribunales de Puerto Rico y de muchos otros países en aquella época.

Además, distinto a lo que señala la Opinión mayoritaria, seis años después de la resolución de *Toppel*, en *Zarelli v. Registrador*, este Tribunal no "obvió" el razonamiento de *Toppel* para restablecer la vigencia del estatuto real en casos de inmuebles gananciales, sino que se distinguió el precedente.[117] Ese caso claramente señala que el Tribunal no utilizó *Toppel* porque no se trataba de una liquidación de bienes gananciales y las partes no estaban cuestionando la aplicación de las leyes de Puerto Rico.[118] En el presente caso también es necesario distinguir a *Toppel*.

En *Toppel*, las partes no eran puertorriqueños casados en Puerto Rico bajo el régimen de sociedad de gananciales, sino una mujer británica y un hombre estadounidense que se casaron en Nueva York, donde no rige el precepto matrimonial de gananciales. Su relación con Puerto Rico para efectos de la división de bienes gananciales se debía a que habían residido y construido su fortuna en la Isla

---

[117] *Véase* Opinión mayoritaria, pág. 25.

[118] Zarelli v. Registrador, 124 D.P.R. 543, 550 esc. 4 (1989).

durante 13 años y se habían divorciado en este país. Como explica el profesor Raúl Serrano Geyls, *Toppel* continúa vigente para situaciones como las de ese caso: dos extranjeros casados en el extranjero que tienen bienes en Puerto Rico y se divorcian aquí. Según señala, ello se debe a que nuestras leyes no pueden alcanzar bienes de personas extranjeras ubicados fuera de nuestros límites territoriales.[119] Los hechos del caso ante nuestra consideración son muy diferentes, pues se trata de dos puertorriqueños que se casaron en Puerto Rico bajo el régimen de sociedad de gananciales y tienen bienes tanto en la Isla como en el extranjero.

Por todo lo anterior, no se justifica reducir la fuerza vinculante de *Toppel*, un precedente importante para la interpretación de nuestra política constitucional de igualdad entre los géneros.[120] En *Toppel* se dividieron los inmuebles del matrimonio sitos en Puerto Rico según las leyes de Puerto Rico sobre sociedad de bienes gananciales, pero no porque aplicara el estatuto real, artículo 10 de nuestro Código Civil. Tenía que hacerse así porque el

---

[119] R. Serrano Geyls, <u>Derecho de Familia de Puerto Rico y legislación comparada</u>, San Juan, Ed. Programa de Educación Jurídica Continua Universidad Interamericana de Puerto Rico, 1997, Vol. 1, pág. 510.

[120] *Véanse* J.J. Álvarez González, <u>Derecho Constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos</u>, Bogotá, Ed. Temis, 2009, pág. 868; I. Ramos Buonomo, <u>Derecho de Familia</u>, 75 Rev. Jur. UPR 293, 316 (2006).

estatuto real no se puede aplicar a todo tipo de controversias sobre inmuebles sin cometer injusticias en algunos casos.

Por otro lado, tampoco aplica al presente caso el artículo 1277 del Código Civil que la Opinión mayoritaria cita para rechazar las aportaciones de *Toppel* a nuestra doctrina sobre división de bienes gananciales. Dicho artículo dispone la ley que regirá a los matrimonios en los que uno de los miembros de la pareja sea puertorriqueño y el otro sea extranjero y que se casen fuera de Puerto Rico.[121] Además, el que el texto de ese artículo se haya enmendado, como consecuencia de lo resuelto en *Toppel*, para añadir que se atenderán factores como el conflicto móvil y el centro de intereses conyugales, no cambia en nada la norma vigente de que a las parejas puertorriqueñas que hayan contraído matrimonio en Puerto Rico sin otorgar capitulaciones matrimoniales válidas les aplica el régimen de sociedad de gananciales y el mismo es inmutable. Esa enmienda se realizó para atender una situación de conflicto de leyes relacionada con matrimonios extranjeros y de ninguna manera reduce el alto interés público que tiene el matrimonio en nuestro ordenamiento.[122]

_____

[121] 31 L.P.R.A. sec. 3561.

[122] *Véase* Opinión mayoritaria, pág. 28-31, 38-40.

IV

El artículo 11 del Código Civil de Puerto Rico dispone que los contratos se rigen por las leyes del país en que se otorguen, pero con una excepción: "las leyes prohibitivas concernientes a las personas, sus actos o sus bienes, y las que tienen por objeto el orden público y las buenas costumbres, no quedarán sin efecto por leyes o sentencias dictadas ni por disposiciones o convenciones acordadas en países extranjeros".[123] Por lo tanto, la vigencia de los contratos realizados en el extranjero que se quieran hacer valer en Puerto Rico queda supeditada a la política pública y las leyes de este país.

En *Colón Aponte v. Registrador*, advertimos que el tercer párrafo del artículo 11 impide que se lleven a cabo negocios fuera de Puerto Rico con el fin de burlar las leyes prohibitivas de la Isla sobre asuntos que afecten relaciones o bienes en Puerto Rico.[124] En ese caso, nos negamos a darle validez a un testamento mancomunado, realizado por un matrimonio en un país donde está permitido testar de esa manera, mediante el cual se le transfería a

---

[123] 31 L.P.R.A. sec. 11. Esta excepción, que se encuentra en el tercer párrafo de dicho artículo, también aplica al artículo 10 del Código Civil (el estatuto real). El párrafo citado comienza con la frase: "No obstante lo dispuesto en esta sección y en la anterior".

[124] 67 D.P.R. 17, 23 (1947). Véanse también las discusiones sobre la importancia del lugar donde el contrato va a tener efecto tanto en la Opinión mayoritaria como en la disidente de Rivera Nieves v. Registrador, 93 D.P.R. 914 (1967).

la esposa una finca perteneciente a la sociedad de gananciales constituida por ambos y ubicada en Puerto Rico. Explicamos que los testamentos mancomunados no están permitidos en Puerto Rico, por lo que no podíamos avalar que se hiciera uno en otro país para afectar inmuebles matrimoniales en la Isla. Asimismo, al resolver un conflicto entre las leyes de Puerto Rico y las de Venezuela relacionado con el reconocimiento de un hijo, en *Martínez v. Pérez Viuda de Martínez* explicamos que, si la ley extranjera aplicable a la controversia contradijera una disposición de orden público de Puerto Rico, se le daría preeminencia al derecho puertorriqueño porque el artículo 11 impide que los tribunales de Puerto Rico pongan en vigor leyes, sentencias o acuerdos de países extranjeros que violen las políticas y buenas costumbres de nuestro país.[125]

De manera similar, en casos de conflicto de leyes interestatal en los que se ha invocado la cláusula de entera fe y crédito, el Tribunal Supremo de Estados Unidos ha indicado que un estado o territorio no tiene que subordinar sus leyes sobre contratos a las del estado en el que se realizó el contrato. Al contrario, si el foro tiene

---

[125] 88 D.P.R. 443, 454-455 (1963). Véase también la Opinión concurrente del juez Hernández Denton en el caso López Torres v. González, 151 D.P.R. 225 (2000, Sentencia), en la que se explica que, debido al alto interés público que tienen las capitulaciones matrimoniales, no se pueden hacer valer en Puerto Rico unas que no cumplen con los requisitos de las leyes puertorriqueñas, aunque se hayan realizado conforme a las leyes del lugar donde se otorgaron.

un interés legítimo en aplicar sus propias leyes a la controversia, puede utilizar su normativa sobre contratos para evaluar el contrato que se preparó según las leyes del otro estado.[126] Asimismo, ha decidido que los derechos adquiridos mediante un contrato realizado en un estado distinto al foro se pueden hacer valer en éste siempre y cuando no violen la política pública del foro.[127] Por eso, cuando se presentan contratos cuyo fin es modificar el régimen matrimonial, realizados por los cónyuges en jurisdicciones donde dicho pacto es permitido, los tribunales de estados cuyas leyes admiten esos contratos los han reputado válidos, pero los de estados cuyas leyes los prohíben han rechazado hacerlos valer.[128]

Aunque en nuestro Derecho de Contratos se le da gran peso a la voluntad de las partes, nuestro ordenamiento también establece instancias en las que no es posible ejecutar lo que éstas han convenido porque ello va en contra de las leyes, la moral o el orden público del País.[129] El ordenamiento jurídico puertorriqueño mantiene

---

[126] _Watson v. Employers Liability Assurance Corp._, 348 U.S. 66, 73 (1954).

[127] _Griffin v. McCoach_, 313 U.S. 498, 506-507 (1941).

[128] Scoles & Hay, _op. cit._, pág. 490.

[129] Véanse, como ejemplos, las disposiciones del Código Civil de Puerto Rico sobre la voluntad de las partes en la contratación, artículos 1221, 1225, 1228 a 1235 y 1248 a 1250, y sobre las restricciones a los pactos que pueden realizar las partes contratantes, artículos 1222, 1225 y

varias restricciones a los negocios jurídicos que pueden celebrar los cónyuges. Las mismas tienen su base en la inmutabilidad del régimen matrimonial y en la política pública de protección al cónyuge más débil de presiones del más fuerte para controlar el patrimonio económico.[130] Nuestro ordenamiento considera de alto interés público estas y otras disposiciones relativas al matrimonio.[131]

El artículo 1347 de nuestro Código Civil prohíbe las compraventas entre cónyuges que no hayan pactado previamente la separación de bienes en capitulaciones matrimoniales.[132] Asimismo, el artículo 1286 veda toda donación entre los cónyuges durante el matrimonio, sin importar el régimen imperante entre ellos. Sólo se permiten regalos módicos, según el estatus económico de la familia, en ocasiones de regocijo familiar. Todas las demás donaciones son nulas, o sea, nunca sucedieron.[133] El contrato que se celebró en Florida en el presente caso es nulo, porque los cónyuges no podían hacerse donaciones

1238. 31 L.P.R.A. secs. 3371-3372, 3375, 3391, 3401-3407, 3421, 3471-3473.

[130] Serrano Geyls, *op. cit.*, pág. 317.

[131] *Véanse*, como ejemplos, López Torres v. González, *supra*, a las págs. 252-253; Ortiz Ortiz v. Sáez Ortiz, 90 D.P.R. 837, 838 (1964).

[132] 31 L.P.R.A. sec. 3772.

[133] 31 L.P.R.A. sec. 3588. Tampoco está permitida la cesión de la participación en los bienes gananciales de un cónyuge a otro sino hasta luego de disuelto el vínculo matrimonial. Art. 1316, Cód. Civ. PR, 31 L.P.R.A. sec. 3691.

entre sí durante el matrimonio. Aun si se considerara que fue un contrato de compraventa, a pesar de que parece ser una donación simulada pues intercambiaron un inmueble por diez dólares, tampoco sería válido, pues están prohibidas las compraventas entre los miembros de la sociedad legal de gananciales, que es el régimen que gobierna a los cónyuges en este caso.

Más aun, si analizamos el contrato según las doctrinas de los *common law states*, nos encontramos con que la clasificación de un bien puede cambiar de matrimonial a separado por una acción voluntaria de las partes durante el matrimonio, pero un cambio de título mediante contrato de por sí no cambia la clasificación si otras razones apuntan hacia mantener la categoría original, ya que dejar la clasificación al arbitrio de los cónyuges puede prestarse a abusos.[134] Si mediante el acuerdo un cónyuge transfiere sus derechos sobre el bien al otro cónyuge, se analiza si hubo intención de donar.[135] Aquí, el señor Roselló Puig ha señalado, y la señora Rodríguez Cruz no ha negado, que el propósito no era cambiar la clasificación del bien de ganancial a privativo, sino evitar que sus acreedores cobraran sus deudas contra la propiedad conyugal. Otro

---

[134] Turner, *op. cit.*, págs. 69-70, 652-680. En Puerto Rico también la inscripción a título privativo no es definitiva, pues se puede presentar prueba de que el bien es ganancial. Méndez v. Ruiz Rivera, 124 D.P.R. 579 (1989).

[135] Turner, *op. cit.*, págs. 661-679.

hecho que se toma en consideración en los *common law states* es si el cónyuge que hace la transferencia de la propiedad termina toda relación con la misma.[136] En este caso sucedió lo contrario y el señor Roselló Puig continuó aportando al pago de la hipoteca hasta que la señora Rodríguez Cruz vendió el inmueble. Aunque el análisis bajo las normas de distribución equitativa sería más extenso, estos son indicios de que el traspaso podría quedar igualmente sin efecto si se hiciera la división posdivorcio fuera de Puerto Rico.

V

El señor Roselló Puig y la señora Rodríguez Cruz se casaron en Puerto Rico sin hacer capitulaciones matrimoniales, conscientes de que el régimen de sociedad de bienes gananciales gobernaría sus relaciones patrimoniales durante todo el matrimonio, ya que el régimen matrimonial seleccionado es inmutable.[137] Según alegan las partes, durante los 25 años que estuvieron casados, vivieron aproximadamente 10 años en Puerto Rico y alrededor de 15

---

[136] *Id.* pág. 659.

[137] Durante el proceso de revisión del Código Civil de Puerto Rico que se llevó a cabo en la pasada década, se propuso abolir la inmutabilidad del régimen matrimonial, pero esas recomendaciones aún están pendientes de discusión. *Véase* Z. Cruz Torres, Reforma del Derecho Internacional Privado Puertorriqueño en el matrimonio y su régimen económico, 43 Rev. Jur. UIPR 151 (2008). *Véase también* M. Fraticelli Torres, Un nuevo acercamiento a los regímenes económicos en el matrimonio: la sociedad legal de gananciales en el Derecho Puertorriqueño, 39 Rev. Jur. UIPR 113 (2004).

años en Florida. Las alegaciones de ambas partes reflejan que mientras residieron en Florida mantuvieron su vínculo con Puerto Rico y adquirieron bienes en este país. De las distintas propiedades inmuebles que compraron las partes durante su matrimonio, la única ubicada fuera de Puerto Rico fue la casa de Florida que es eje de esta controversia. Los esposos sabían que la propiedad ubicada en Florida era ganancial cuando hicieron el contrato para intentar transferirla a título privativo de la señora Rodríguez Cruz. Cuando la pareja se separó, previo al divorcio, ambos cónyuges se mudaron a Puerto Rico. Asimismo, se divorciaron en Puerto Rico.

Ante estos hechos, no resulta arbitrario que los tribunales de Puerto Rico a los que las partes acudieron decidan aplicar las leyes de Puerto Rico a las controversias relacionadas con la división de bienes posdivorcio, proceso que se está llevando a cabo en Puerto Rico. Así hacerlo constituye aplicar la ley del foro a una situación con la cual el foro tiene una relación significativa, siguiendo la tendencia actual de selección de ley aplicable para casos de división de bienes posdivorcio. Además, permite que todos los bienes y las controversias sobre la división se atiendan bajo una sola ley, como recomienda la norma de unicidad patrimonial avalada en gran parte de los estados de Estados Unidos y en otros países. Asimismo, conlleva que Puerto Rico, como foro

en el que se está atendiendo la controversia, ponga en vigor su política pública y salvaguarde los intereses sobre las relaciones matrimoniales que defiende, en lugar de colocar por encima de éstos los intereses propietarios protegidos por las leyes de Florida.

Como vimos, la regla de utilizar la ley del sitio donde un inmueble está ubicado para regir todas las controversias relacionadas con ese bien ha sido descartada para casos de división de bienes posdivorcio. Aún si continuara vigente, el artículo 10 del Código Civil, que señala que los inmuebles están sujetos a las leyes del país en el que están localizados, no aplica en toda ocasión, pues el artículo 11 funciona como norma de excepción para éste. En este caso, el inmueble se encuentra en Florida, pero el contrato realizado de acuerdo con las normas de esa jurisdicción no puede ser ejecutado en Puerto Rico, pues va en contra de una ley prohibitiva concerniente a las personas y sus bienes, que es a la vez una disposición de orden público. El ordenamiento puertorriqueño prohíbe los contratos de compraventa y las donaciones entre cónyuges casados bajo el régimen de sociedad de bienes gananciales. Como dispone el artículo 11, estas prohibiciones no quedan sin efecto por el hecho de que el inmueble en controversia esté ubicado en Florida o porque el contrato relacionado con el inmueble se haya otorgado en ese estado y sea válido allá.

Entiendo, como el Tribunal de Apelaciones, que el contrato entre los cónyuges no cambió la naturaleza ganancial del inmueble sito en Florida, pues los bienes adquiridos por el señor Roselló Puig y la señora Rodríguez Cruz pertenecían a la sociedad de gananciales que ellos componían al momento del contrato. Dado que el régimen matrimonial seleccionado por ellos en Puerto Rico era inmutable, no podían hacer una excepción para que el esposo le traspasara a la esposa ese bien. La sociedad de gananciales, con los derechos y las prohibiciones que ésta acarrea, siguió siendo la misma mientras los cónyuges vivieron en Florida y ésta estuvo regida en todo momento por las leyes de Puerto Rico.

La cláusula constitucional de entera fe y crédito no requiere el resultado escogido por la mayoría. No podemos erigir una barrera para la administración de las leyes de Puerto Rico que la Constitución de Estados Unidos no impone, y mucho menos cuando el efecto de esa traba es ignorar el ordenamiento jurídico vigente en el País sobre un aspecto de sumo interés público.

Liana Fiol Matta
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Carlos Roselló Puig

    Recurrido

                          CC-2006-1031

      v.

Ruth N. Rodríguez Cruz

    Peticionaria


Opinión disidente emitida por la Juez Asociada señora Rodríguez Rodríguez


     San Juan, Puerto Rico, a 11 de octubre de 2011

    Disiento de la opinión del Tribunal porque considero que la Opinión mayoritaria enmarca erradamente la controversia en este caso en el derecho internacional privado de contratos entre cónyuges, cuando de lo que se trata es de una controversia de derecho internacional privado de derecho de familia relativa a la división de bienes matrimoniales. El error conceptual de la mayoría, entre otras cosas, lo lleva a revocar un precedente de hondo calado, *Toppel v. Toppel*, 114 D.P.R. 775 (1983), sin que ello fuera necesario y bajo un razonamiento, a mi juicio, tanto deficiente como insuficiente.

El asunto que debemos abordar versa sobre el carácter privativo o ganancial de un inmueble sito en el estado de Florida, cuando una pareja se estableció en más de una jurisdicción durante la vigencia de su matrimonio. Específicamente, debemos resolver qué efecto tiene, sobre la naturaleza ganancial o privativa de un inmueble, el que una pareja de puertorriqueños que contrajo matrimonio en Puerto Rico bajo el régimen legal de gananciales y posteriormente estableció su residencia en Florida, otorgue un contrato para transferir su titularidad de manera exclusiva a uno de los cónyuges. Asimismo, nos compete determinar bajo qué ley se debe realizar el procedimiento de clasificación y división de los bienes, incluyendo el inmueble sito en Florida.

Repasemos los hechos en este caso.

I.

Carlos Roselló Puig y Ruth N. Rodríguez Cruz se casaron en Puerto Rico bajo el régimen de sociedad legal de gananciales. Luego de varios años de convivencia en la Isla, la pareja se mudó a Florida. Allí compraron un inmueble que les sirvió como hogar familiar durante los años de estadía en ese estado. El 29 de abril de 1997, la titularidad que ambos cónyuges ostentaban sobre el inmueble se transfirió a favor de la señora Rodríguez Cruz exclusivamente, a cambio de $10, mediante escritura pública conforme autorizan las leyes de Florida. Más adelante, las partes regresaron a Puerto Rico. El

matrimonio se disolvió mediante sentencia de divorcio el 7 de abril de 2003, por la causal de separación. Posteriormente, la señora Rodríguez Cruz vendió el inmueble sito en Florida.

El 27 de octubre de 2003, el señor Roselló Puig presentó una demanda ante el Tribunal de Primera Instancia, en la que solicitó la división de la comunidad postganancial. Entre sus alegaciones, aseveró que pagó el préstamo hipotecario del inmueble ubicado en Florida hasta agosto de 2003, fecha en que la señora Rodríguez Cruz lo vendió por la suma de $450,000. También adujo que, como el inmueble se adquirió durante la vigencia del matrimonio, la propiedad le pertenecía a la sociedad legal de bienes gananciales y él tenía derecho al 50% del dinero producto de la venta.

Luego de varios eventos procesales, la señora Rodríguez Cruz presentó una moción de sentencia sumaria en la que solicitó que se reconociera la naturaleza privativa del inmueble sito en Florida. El 4 de abril de 2005, el Tribunal de Primera Instancia dictó una resolución en la que dispuso que el inmueble era un bien privativo porque el señor Roselló Puig había cedido su parte a favor de la señora Rodríguez Cruz mediante un negocio jurídico válido de acuerdo a las leyes de la jurisdicción donde ubica el inmueble.

Insatisfecho, el señor Roselló Puig presentó un recurso de *certiorari* ante el Tribunal de Apelaciones. Alegó que las donaciones o compraventas entre cónyuges que contraen matrimonio bajo el régimen de sociedad legal de gananciales están prohibidas por nuestro ordenamiento, aunque se trate de un inmueble sito fuera de Puerto Rico.

En su sentencia, el Tribunal de Apelaciones revocó el dictamen del foro inferior. Concluyó que la "cesión o transferencia simulada" no alteró la naturaleza ganancial del bien, pues el artículo 11 del Código Civil de Puerto Rico establece que las leyes prohibitivas relacionadas a las personas, sus actos o sus bienes no quedan sin efecto por leyes o sentencias dictadas en países extranjeros. Sin embargo, el foro intermedio reconoció la validez de la venta del bien inmueble a un tercero. Asimismo, determinó que la pareja mantuvo su domicilio conyugal en Puerto Rico y que no se apartó del derecho puertorriqueño. Por lo que concluyó que, en la relación entre sí, los cónyuges continuaban sujetos a las leyes relativas a la sociedad legal de gananciales y la comunidad postganancial. También señaló que el dinero obtenido de la compraventa sustituyó el bien, por lo que se debía incluir como un activo ganancial al que tienen derecho los ex cónyuges, por partes iguales.

De esta sentencia acudió ante este Tribunal la señora Rodríguez Cruz.   En su recurso de *certiorari*, la peticionaria aduce que el foro intermedio obvió el principio *lex rei sitae* que recoge el artículo 10 del Código Civil.  31 L.P.R.A. sec. 10.  Además, indicó que la determinación del foro intermedio viola las doctrinas de conflicto de leyes, la cláusula de entera fe y crédito y la igual protección de las leyes.   Por su parte, el recurrido alegó que el régimen económico matrimonial seleccionado a la fecha del matrimonio es el que debe aplicar para la división de bienes, por lo que el producto de la venta del inmueble debe reputarse ganancial.   Añade que al momento de la división de bienes gananciales se debe aplicar el principio de unicidad patrimonial reconocido por este Tribunal en *Toppel v. Toppel*, 114 D.P.R. 775 (1983).

II.

La relación anterior pone sobre el tapete la naturaleza de la controversia que debemos atender.   La parte recurrida reconoce que el traspaso de titularidad se realizó conforme a las leyes de Florida, por lo que no se cuestiona la validez de esa transacción para efectos de la venta a un tercero.   El asunto a dilucidar es qué normas deben aplicar al liquidar una sociedad legal de gananciales cuando un bien que se alega forma parte del

caudal está sito en una jurisdicción distinta de aquella donde se decretó el divorcio y se realiza la división, y existe un conflicto de leyes entre las jurisdicciones que incide sobre la división. Ello nos lleva, necesariamente, a abordar esta controversia desde la perspectiva del derecho internacional privado.

A.

Las transformaciones sociales de las últimas décadas han propiciado una mayor capacidad móvil de las nuevas generaciones. Este fenómeno, cada vez más presente, se alza como un aspecto imprescindible para comprender los cambios sociales y las transformaciones que acontecen en las sociedades modernas y post industriales. Manuel Castells, *La era de la información: economía sociedad y cultura*, 2005, Alianza Editorial, Madrid, Vol. I. Sus causas son variadas: la globalización, la individualización y el desarrollo de nuevas tecnologías de la comunicación se identifican como algunas de ellas. Su impacto, por otra parte, se manifiesta no tan sólo en la esfera económica y política, sino también en la esfera familiar. Véase, [www.jobmob-and-famlives.eu](www.jobmob-and-famlives.eu), última visita 4 de agosto de 2011.

Ya es usual que un matrimonio, durante su vigencia, establezca su domicilio en más de una jurisdicción. Esto supone nuevos retos para los ordenamientos legales en la

medida en que las normas sobre las relaciones económicas entre los cónyuges varían de jurisdicción en jurisdicción, al punto de generar normas conflictivas al momento de determinar cómo se clasifican y se dividen los bienes adquiridos durante el matrimonio para propósitos de la liquidación de la comunidad postganancial.

El caso ante nuestra consideración presenta, precisamente, un problema de conflicto de leyes generado por el traslado de las partes -mientras estaban casadas- al estado de Florida, y la adquisición allí de un inmueble y su posterior traspaso a uno de los cónyuges conforme permiten las leyes del estado de Florida. La solución que el Tribunal ofrece para resolver este conflicto no es la adecuada para estos tiempos. Ello, pues ignora las tendencias modernas en materia de derecho internacional privado de familia y se aferra a una doctrina que no fue concebida para el procedimiento de división de bienes gananciales. Veamos.

### B.

Cada jurisdicción determina cómo sus tribunales van a atender las controversias sobre conflicto de leyes. *Restatement (Second) Conflicts of Laws*, sec. 6, 1971. En nuestro ordenamiento, estas reglas están recogidas principalmente en los artículos 9 al 11 del Código Civil. En lo pertinente, el artículo 9, denominado estatuto

personal, establece que la ley del domicilio de la persona aplica a los derechos y deberes de familia, o al estado, condición y capacidad legal. 31 L.P.R.A. sec. 9. Por su parte, el artículo 10, conocido como el estatuto real, recoge el principio *lex rei sitae* y atiende el conflicto de leyes sobre bienes: "Los bienes muebles están sujetos a la ley de la nación del propietario; los bienes inmuebles, a las leyes del país en que están sitos." 31 L.P.R.A. sec. 10.

La Opinión mayoritaria determina que el bien inmueble sito en Florida es privativo al aplicar a esta controversia el estatuto real, así como la cláusula de entera fe y crédito de la Constitución de Estados Unidos. Ello así, pues concluye que conforme a nuestro estatuto real, la transferencia de titularidad del inmueble sito en Florida por parte de los cónyuges a favor de uno de ellos es un negocio jurídico válido a tenor con las leyes de ese estado. En un confuso análisis, el Tribunal aplica el principio *lex rei sitae* al procedimiento de división de comunidad de bienes postganancial para decretar que ese inmueble es de carácter privativo. De este modo, el Tribunal adjudica la naturaleza privativa del inmueble a base del título de propiedad únicamente, sin considerar

las normas de clasificación de Puerto Rico o de Florida.[138]

Añade el Tribunal que la determinación de si existe un crédito por el dinero utilizado para la adquisición del bien y el pago de la hipoteca, deberá regirse por la ley del lugar donde la pareja tenía su domicilio conyugal al momento de adquirir la propiedad y de realizar el traspaso. Devuelve entonces el caso al Tribunal de Primera Instancia para que determine el domicilio conyugal y aplique la ley de esa jurisdicción a la adjudicación del crédito sobre el inmueble sito en Florida. No comparto este razonamiento.

De una lectura de las normas estatutarias de los artículos 9 al 11 del Código Civil, se desprende que estas reglas generales no contemplan expresamente un mecanismo para atender el conflicto móvil en cuanto a la división de bienes como resultado de un divorcio. Por una parte, se podría argumentar que este procedimiento postmatrimonial se debe regir por el estatuto personal, pues es un asunto relativo al matrimonio. Por otro lado, la división de bienes incide directamente sobre el patrimonio de los ex cónyuges, lo cual podría justificar la aplicación del estatuto real.

---

[138] Recordemos que, en nuestro ordenamiento, la titularidad activa una presunción sobre la naturaleza del bien que puede ser rebatida si se prueba que el dinero utilizado en la adquisición era ganancial.

El Tribunal decide que se debe aplicar el estatuto real porque, a su entender, así lo dicta el artículo 10 del Código Civil. Sin embargo, no nos enfrentamos a una controversia sobre la titularidad del inmueble, sobre la validez del contrato que los cónyuges otorgaron entre sí en Florida o sobre el reconocimiento de este acto en nuestra jurisdicción. Se trata de determinar si procede incluir el inmueble sito en Florida, o el dinero obtenido de la venta al tercero, en el inventario del caudal a ser dividido. Para ello, debemos determinar antes la naturaleza, privativa o ganancial, del dinero obtenido de la venta del inmueble sito en Florida. Lamentablemente el Tribunal no comprende adecuadamente la diferencia entre un asunto y otro para efectos de la norma que adopta.

La experiencia de los tribunales ha demostrado que la aplicación mecánica de estas disposiciones a controversias que surgen en el derecho de familia podría culminar en resultados inadecuados. Así lo reconoce la doctrina, por lo que se han desarrollado normas específicas para atender los conflictos de leyes en este ámbito del derecho. Ante la ausencia de una disposición en nuestro ordenamiento jurídico que atienda este asunto de derecho internacional privado, establecimos la norma en *Toppel v. Toppel*, 114 D.P.R. 775 (1983). Repasemos la norma allí pautada, ya que ésta gobierna a la controversia que hoy atendemos.

C.

En *Toppel v. Toppel*, *ante*, un hombre estadounidense residente de Nueva Jersey y una mujer británica contrajeron matrimonio en el estado de Nueva York. Al poco tiempo, la pareja se trasladó a Puerto Rico donde estuvieron domiciliados por la mayor parte de la duración del matrimonio. Posteriormente, obtuvieron una sentencia de divorcio en Puerto Rico y procedieron a la división postmatrimonial de sus bienes. Al enfrentarnos a un posible conflicto de leyes, reconocimos que existía un vacío en nuestro ordenamiento en cuanto a la norma de derecho internacional privado que aplica a un procedimiento de partición de bienes. En tal sentido aseveramos: "El hecho de que el divorcio era desconocido en España para el tiempo en que se aprueba el Código Civil basta de por sí para demostrar que, al menos en cuanto a tal aspecto, estamos ante una laguna de la ley." *Toppel v. Toppel*, *ante*, pág. 782. Nuestra normativa estatuaria no ha variado o modificado este hecho.

Luego de evaluar las tendencias doctrinales de la época, adoptamos la doctrina del centro de los intereses matrimoniales atemperada a la teoría estadounidense de los contactos dominantes o relación significativa para determinar la ley que rige los bienes matrimoniales. *Toppel v. Toppel*, *ante* pág. 791. En ambas, el domicilio

conyugal o residencia habitual es un factor determinante, pero no es el único a considerar. Al amparo de esta norma, ordenamos la división de la masa de bienes de la comunidad conforme a la ley de la jurisdicción que fue el centro de intereses de la pareja conyugal durante la vigencia del matrimonio.

Por otro lado, para determinar el centro de intereses conyugal indicamos que se deben examinar varios factores además del domicilio. Entre éstos, se encuentran los siguientes intereses: la localización principal de los intereses financieros (inversiones e ingresos), los lazos afectivos, la duración de la residencia, la nacionalidad de los cónyuges, las necesidades de los sistemas interestatal e internacional, las políticas relevantes de los foros afectados, la protección de expectativas justificadas, la previsibilidad y uniformidad del resultado en situaciones análogas, la protección de la parte más débil, además de la facilidad en la determinación y aplicabilidad de la regla más justa. *Toppel v. Toppel*, *ante*, págs. 791-92.

De este modo, acogimos la regla de mutabilidad que permite que luego de contraer matrimonio bajo un régimen económico supletorio, los cónyuges lo modifiquen bajo ciertas circunstancias. Nos alejamos así de la regla de la inmutabilidad que considera que el régimen seleccionado

a la fecha en que se contraen nupcias aplicará siempre a la relación entre los cónyuges durante el matrimonio, e incluso a los procedimientos posteriores a su disolución.

Sin embargo, ello no significa que cada bien se clasificará y dividirá de forma individual según el lugar donde radiquen los intereses o la pareja establezca su domicilio a la fecha de adquisición. Por esta razón, incorporamos el principio de unicidad patrimonial para tratar todos los bienes como una masa que se divide al amparo de una sola ley. Al preparar el inventario, tanto los bienes muebles como los bienes inmuebles se clasifican según las normas de la ley bajo la cual se hace la división.

Los ex cónyuges Roselló Puig y Rodríguez Cruz son puertorriqueños que contrajeron matrimonio en Puerto Rico bajo el régimen supletorio de la sociedad legal de bienes gananciales. Durante el matrimonio, se establecieron en el estado de Florida por un periodo prolongado. Posteriormente, regresaron a Puerto Rico, donde se divorciaron y se encuentran actualmente en el procedimiento de división de bienes. Como parte de esta acción, surgió la controversia sobre la clasificación del bien inmueble sito en Florida, cuya titularidad fue transferida a favor de la señora Rodríguez Cruz y que ella vendió a un tercero.

Luego del divorcio, la masa de bienes matrimoniales se debe entender como una sola unidad para propósitos de establecer la ley aplicable a la división de bienes matrimoniales. Conforme se discutirá más adelante, por razones de justicia y economía procesal, esta ley debe regir tanto la clasificación de los bienes como el procedimiento de división. Afín con el principio de unicidad patrimonial, todos los bienes, incluyendo los adquiridos fuera de Puerto Rico, se deben clasificar según la ley aplicable al procedimiento de división.

Coincidimos con la Opinión mayoritaria en que el Tribunal de Primera Instancia no ha determinado cuál fue el domicilio conyugal durante el matrimonio. De igual modo, no ha decretado cuál fue el centro de intereses. Siendo ello así, se debe devolver el caso al foro primario pero para que se determine cuál fue el centro conyugal de intereses a la luz de *Toppel v. Toppel*. A base de esa determinación se decidirá la ley aplicable para el procedimiento ante su consideración, lo que incluye tanto la clasificación de los bienes como su división. De considerar el foro primario que el matrimonio tuvo más de un centro de intereses, debe aplicar entonces la ley del foro si éste es uno de ellos, ya que tiene jurisdicción sobre ambas partes y es la ley que mejor conoce.

III.

Pese a lo anterior, el Tribunal se niega a aplicar a este caso lo decidido en *Toppel v. Toppel*, *ante*, y procede a revocar este precedente. La mayoría considera que la norma establecida en *Toppel v. Toppel* es contraria al historial legislativo del Código Civil. Al descartar la normativa vigente, realiza una aplicación defectuosa de nuestras reglas de derecho internacional privado. Así, sostiene que su interpretación del estatuto real responde a la práctica estadounidense de extender el principio *lex rei sitae* a cualquier controversia sobre bienes.

Por considerar que el Tribunal incide en su razonamiento, y ante la falta de discusión en la Opinión sobre la doctrina de derecho internacional privado aplicable a la controversia que enfrentamos hoy, consideramos necesario examinar cómo se ha desarrollado este tema en otras jurisdicciones. Además, atenderemos en detalle los fundamentos deficientes que se invocan para revocar *Toppel v. Toppel*, *ante*.

A.

El derecho internacional privado reconoce la mutabilidad y la inmutabilidad del régimen económico matrimonial como principios generales aplicables para atender conflicto de leyes que se suscitan sobre bienes matrimoniales. El principio de inmutabilidad establece que los cónyuges seleccionan un régimen económico a la

fecha del matrimonio y esa será la ley aplicable durante la vigencia del matrimonio y para la división de bienes. Kathrin Kroll, *Unification of Conflict of Laws in Europe* en *European Challenges in Contemporary Family Law* (Katharina Boele-Woelki y Tone Sverdrup, eds.), Portland, Editorial Intersentia, 2008, pág. 381; Thomas Oldham, *What if the Beckhams move to L.A. and Divorce? Marital Property Rights of Mobile Spouses When They Divorce in the United States*, 42 Fam. L.Q. 263, 265 (2008). Ésta es la práctica mayoritaria en los países europeos. Kroll, *ante*. Se reconoce que este principio ofrece el beneficio de la estabilidad y previsibilidad de la ley aplicable, pero presenta el problema de atentar contra la voluntad de las partes de adoptar el régimen de la nueva jurisdicción en la que se establecieron. Además, implica que el tribunal del foro aplicaría una ley que, como norma general, no conoce con profundidad. Oldham, *What if the Beckhams move to L.A. and Divorce?*, *ante*; Marsh, *op. cit.*, pág. 106.

Por su parte, el principio de mutabilidad reconoce el derecho de la pareja conyugal a modificar el régimen económico que regía a la fecha de contraer nupcias si se traslada a otra jurisdicción y concurren ciertos factores. Marsh, *op. cit.*, pág. 104. Por ejemplo, el artículo 7 de la Convención de la Haya de 1978 sobre la Ley Aplicable a Regímenes de Propiedad Matrimonial, considera esta

posibilidad cuando los cónyuges cambian su residencia habitual al país de su nacionalidad común o cuando permanecen en esa jurisdicción por un periodo mínimo de diez años. Convención de la Haya sobre la Ley Aplicable a Regímenes de Propiedad Matrimonial, Art. 7, 1978;[139] Kroll, *ante*, pág. 381. La doctrina de la mutabilidad es bien recibida en un número creciente de jurisdicciones, pues respeta la autonomía de la voluntad de los cónyuges.

En Estados Unidos, la mutabilidad tuvo mejor aceptación como principio que rige el régimen económico matrimonial y su posterior división. Esta preferencia se debió, principalmente, al respeto a la voluntad de las personas que comenzaban una nueva vida en Estados Unidos y a facilitar la determinación de la ley aplicable en un país donde, desde sus inicios, sus habitantes eran inmigrantes. Marsh, *op. cit.*, pág. 107; Oldham, *What if the Beckhams move to L.A. and Divorce?, ante*, pág. 288.

Asimismo, la doctrina reconoce varias modalidades o tipos de mutabilidad. La mutabilidad parcial se refiere al principio que establece que los intereses propietarios de los cónyuges sobre bienes adquiridos durante la vigencia del matrimonio se determinan de acuerdo a las

_____

[139] Hasta la fecha, Francia, Luxemburgo y Holanda son los únicos países que han ratificado la Convención de la Haya, información disponible en http://www.hcch.net/index_en.php?act=conventions.status&cid=87, última visita 19 de julio de 2011.

leyes del domicilio matrimonial a la fecha de adquisición. Friedrich K. Juenger, *Marital Property and the Conflicts of Laws: A Tale of Two Countries*, 81 Colum. L. Rev. 1061, 1073 (1981). De este modo, una pareja que cambia de domicilio modifica el régimen económico matrimonial bajo el que contrajo matrimonio para conformarlo al sistema supletorio del nuevo domicilio. Sin embargo, este cambio es efectivo solamente respecto a los bienes adquiridos en el segundo domicilio. Quienes favorecen este proceso señalan que así se protegen los derechos adquiridos y las expectativas de las partes. Marsh, *op. cit.*, pág. 109.

Ahora bien, sólo algunas jurisdicciones estatales han extendido la mutabilidad parcial a la división postdivorcio de bienes. Oldham, *What if the Beckhams move to L.A. and Divorce?, ante*, pág. 268. Ello pues requiere que el tribunal establezca el domicilio conyugal a la fecha en que se adquirió cada bien para aplicarle la ley de división de bienes de esa jurisdicción. Es decir, este proceso requiere que el foro en el cual se realiza la división aplique más de una ley, lo cual afecta la economía procesal y aumenta la carga económica para las partes en el litigio. *Id.*; Juenger, *ante*, pág. 1073.

De otra parte, la mutabilidad completa implica que la división de la totalidad de los bienes se realiza conforme a la ley del lugar donde se decretó el divorcio. Oldham,

*What if the Beckhams move to L.A. and Divorce?, ante*, pág. 269; Marsh, *op. cit.*, pág. 104. Al igual que con el principio de inmutabilidad, el tribunal examina solamente una ley para adjudicar los derechos de las partes, con la diferencia de que estaría aplicando, normalmente, la ley de su jurisdicción. Oldham, *ante*. Un número considerable de las jurisdicciones estatales de Estados Unidos aplican esta norma. Marsh, *op. cit.*, pág. 104; J. Thomas Oldham, *Divorce, Separation and the Distribution of Property*, New York, Law Journal Seminars-Press, 1996, sec. 13.01[5].

El profesor J. Thomas Oldham advierte que la mayoría de los estados que aplican la mutabilidad completa no exigen un periodo mínimo de residencia o que ése sea el domicilio matrimonial habitual, por lo que se puede prestar para la práctica de selección del foro (*forum-shopping*). Oldham, *What if the Beckhams move to L.A. and Divorce?, ante*, pág. 271. Por tanto, recomienda que estos foros deben exigir unos contactos mínimos entre las partes y la jurisdicción antes de aplicar su ley. *Id*. Es menester señalar que la doctrina de mutabilidad completa entra en juego únicamente después de que se decreta el divorcio, por lo que este mecanismo no altera los derechos propietarios de las partes sobre los bienes durante la vigencia del matrimonio. Oldham, *What if the Beckhams move to L.A. and Divorce?, ante*, pág. 269.

Valga señalar que, en tiempos recientes, se han desarrollado otras vertientes del principio de mutabilidad, la diferencia entre unas y otras es la relación entre las partes en el pleito y la ley que aplicaría para el procedimiento de división. Una modalidad sería aplicar la ley del último lugar de residencia común, pues se entiende que ese régimen es la última voluntad compartida. Oldham, *What if the Beckhams move to L.A. and Divorce?*, *ante*, págs. 289-92. Otras jurisdicciones de Estados Unidos han resuelto el problema del conflicto de leyes en la división de bienes aplicando la teoría del estado con "mayor relación significativa," según los criterios establecidos en el *Restatement*. Esta teoría establece que cuando una jurisdicción no ha promulgado una ley para atender expresamente un conflicto de leyes, se deben considerar una serie de factores para determinar qué ley será aplicable. *Restatement (Second) of the Conflicts of Laws*, sec. 6, 1971.[140] Sin embargo, esta doctrina responde principalmente al interés de proteger **derechos propietarios**, por lo que los tribunales

---

[140] El profesor J. Thomas Oldham señala que el *Restatement* resulta inadecuado para atender ciertos problemas de conflicto de leyes en el ámbito del divorcio, pues data de antes de las leyes de distribución equitativa. Oldham, *ante*, págs. 272-73. El profesor Brett Turner también ha criticado la aplicación de esta teoría, ya que algunos tribunales la utilizan solamente para la clasificación de los bienes, pero luego dividen a base de la ley del foro. A su entender, se debe aplicar la misma ley para ambas etapas. Turner, *op. cit.*,,sec. 3.13, nota 4.

estatales no la han aplicado de forma uniforme. Oldham, *What if the Beckhams move to L.A. and Divorce?*, *ante*, págs. 272-73.

De otra parte, algunos tribunales evitan el análisis de estas normas y aplican el principio *lex fori* del derecho internacional para dividir los bienes matrimoniales conforme a la ley del foro cuando tienen jurisdicción personal sobre ambas partes. Brett R. Turner, *Equitable Distribution of Property*, 3ra ed., West Group, 2005, Vol. 1, sec. 3:13, pág. 158-60. Sin embargo, este proceder permite que cada cónyuge seleccione el foro que mejor convenga a sus intereses, lo que a su vez podría resultar que se litigue simultáneamente un mismo asunto en más de un tribunal.

                              B.

En el día de hoy, el Tribunal revoca *Toppel v. Toppel*, *ante*, por considerar que este precedente es contrario al historial legislativo del Código Civil. Asevera la mayoría, sin apoyo alguno más allá de la mera aseveración, que la enmienda al artículo 10 del Código Civil de 1902 tuvo la intención de que se aplicara el estatuto real a toda controversia posible que surgiera sobre bienes inmuebles, ya que, según la mayoría, "debimos interpretar ese artículo a la luz de la nueva realidad puertorriqueña que esbozara nuestra Asamblea Legislativa

en el 1902". De este modo, sugiere que la interpretación de nuestro estatuto real se debe adecuar al desarrollo estadounidense del principio *lex rei sitae* y que ello conlleva la aplicación de este principio a cualquier controversia relativa a bienes. El Tribunal no tiene razón.

La Comisión Codificadora del Código Civil de 1902 no contempló el asunto de autos, pues la enmienda no perseguía ese propósito. Don Luis Muñoz Morales nos explica con claridad qué se perseguía: "*En el título preliminar* (art. 10) se mantiene el principio de que los bienes muebles se rigen por la Ley de la Nación del propietario (estatuto personal), y los inmuebles por las del país en que están sitos (estatuto real); pero se suprime la excepción contenida en el artículo concordante del Código Español respecto al caso de sucesión hereditaria." Luis Muñoz Morales, *Reseña histórica y anotaciones al Código Civil de Puerto Rico*, Libro I, 1947, Imprenta Soltero: Santurce, P.R., pág. 25.

El propósito de la enmienda, por lo tanto, fue **eliminar la disposición que declaraba que las sucesiones se regían por el estatuto personal**. Nada más. Adscribirle otra intención a la modificación del artículo introducida en 1902 es desnaturalizar la realidad histórica. Y si esa desfiguración se utiliza para

rechazar y descartar el cuidadoso análisis de *Toppel v. Toppel, ante,* no podemos menos que llamar la atención a tan lamentable análisis. Es evidente que existe un vacío legal sobre qué norma se debe aplicar a la división de bienes postmatrimoniales. Con lo cual, nada de lo resuelto en *Toppel v. Toppel, ante,* es contrario al historial del Código Civil o a la intención legislativa de la enmiendas del 1902. Por lo que el fundamento de la mayoría para revocar a *Toppel v. Toppel, ante,* no se justifica jurídicamente.

La mayoría surca otro camino en su intento de menguar la actualidad de *Toppel v. Toppel, ante.* El resultado es igualmente defectuoso. Asegura que la enmienda al artículo 1277 del Código Civil de 1987 tuvo el efecto de rechazar el principio de unicidad patrimonial que estableció *Toppel v. Toppel.* 31 L.P.R.A. sec. 3561. Esta disposición establece que cuando una persona puertorriqueña contrae matrimonio con una extranjera, fuera de Puerto Rico, sin que medien capitulaciones, aplica la ley del lugar donde establecieron su domicilio conyugal, tomando en cuenta otros factores que en justicia deban considerarse. Colige la Opinión mayoritaria que al cerrar la disposición con la frase "todo sin perjuicio de lo establecido en este título respecto a los bienes inmuebles" se pretendió rechazar el principio de unicidad

del patrimonio matrimonial. **Sin embargo, esta frase estaba incluida en la versión anterior del artículo 1277, por lo que no representa una modificación en reacción a lo resuelto en** *Toppel v. Toppel*.

El propósito de esta medida fue "enmendar el Artículo 1277 del Código Civil de Puerto Rico, según enmendado, **a fin de eliminar el discrimen por razón de sexo que establece dicho artículo en los matrimonios celebrados en país extranjero en que uno de los contratantes es puertorriqueño y el otro es extranjero**". (Énfasis nuestro.) Ley Núm. 4 de 5 de marzo de 1987, Leyes de Puerto Rico, págs. 12-13. La realidad es que la posible convergencia entre esta disposición y el estatuto real no fue lo que motivó la enmienda. No se puede inferir un rechazo de la Legislatura al análisis que *Toppel v. Toppel* hace del estatuto real por el mero hecho de mantener la porción referente al estatuto real. Por lo tanto, es errada la aseveración del Tribunal de que con la enmienda del 1987 al artículo 1277 del Código Civil, "la Asamblea Legislativa rechazó directamente la interpretación que del Art. 10 del Código Civil, *supra*, se realizó en *Toppel v. Toppel*".

Por el contrario, la enmienda al artículo 1277 se debe entender como una aceptación por parte de la Legislatura a lo establecido en *Toppel v. Toppel*. Como ya

se ha señalado, la referencia al estatuto real que permaneció en el artículo luego de la enmienda en nada afecta la norma adoptada en *Toppel v. Toppel.* Más aún, desde entonces aclaramos que la norma allí establecida se circunscribía al ámbito de la relación inter vivos de los ex cónyuges y sostuvimos la importancia del estatuto real en otras áreas del derecho. *Toppel v. Toppel*, *ante*, pág. 784. Además, la propia Opinión mayoritaria reconoce que la Legislatura adoptó los principios esbozados en *Toppel v. Toppel* sobre conflicto móvil y centro de intereses. Es decir, la Opinión del Tribunal invoca fundamentos para sostener su posición que no encuentran apoyo en nuestra realidad histórica-jurídica.

Como vemos, la Opinión mayoritaria revoca *Toppel v. Toppel* amparándose en unas actuaciones legislativas que verdaderamente no son incompatibles con la norma establecida en este precedente. Lamentablemente, este proceder no tan sólo se fundamenta en presupuestos erróneos sino que retrocedemos y retomamos doctrinas de una pasado ya superado. Me explico.

C.

La doctrina y jurisprudencia que la Opinión cita para sostener la aplicabilidad del estatuto real al caso de autos **versan sobre la titularidad o la validez de los**

**negocios jurídicos que se realizan sobre bienes inmuebles durante el matrimonio.** Por ejemplo, la Opinión mayoritaria nos refiere al tratado del profesor Raleigh C. Minor, el cual explica que

> Cada Estado hace lo que está a su alcance con el fin de que sus leyes que **afectan la entrega, traspaso y gravamen de bienes inmuebles** situados dentro de sus límites sean lo más terminantes y precisas posibles. … Y es sumamente importante que las **inscripciones legales de dichas transacciones,** las cuales constituyen series de títulos a los bienes inmuebles, se conserven libres de toda censura, irregularidad o confusión con los requisitos de otros Estados.

> Por tanto viene a ser especialmente parte de la política de todo Estado el no permitir que se verifique **ninguna transacción relativa al traspaso de cualquier derecho o título a la propiedad inmueble** que radica en dicho Estado si con ello se infringe su propia ley ya sea o no válida de acuerdo con las leyes de Estados extranjeros…[141]

Conforme con este texto, el principio *lex rei sitae* persigue la protección de intereses de índole comercial y registral. Se trata del interés gubernamental de poder determinar con previsibilidad la titularidad de los bienes y en mantener la estabilidad de los negocios jurídicos que toman lugar dentro de su territorio.

Cónsono con lo anterior, en *Babilonia v. Registrador,* 62 D.P.R. 688 (1943), aplicamos el estatuto real a una controversia sobre bienes matrimoniales. En ese recurso

---

[141] Opinión mayoritaria, pág. 19, citando a Raleigh C. Minor en *Conflicts of Laws,* según citado en *Colón et al. v. El Registrador,* 22 D.P.R. 369 (1915).

gubernativo se solicitó modificar una constancia sobre titularidad de un bien en el Registro de la Propiedad al amparo de una ley extranjera. De este modo, resolvimos que las transacciones sobre bienes inmuebles que realiza una persona con posterioridad a su matrimonio, se rigen por el estatuto real. Es crucial notar que, nuevamente, el asunto medular recaía sobre la titularidad de un bien inmueble. Sin embargo, la controversia que debemos resolver hoy no nos refiere a esta área del derecho. Los intereses que inspiran las normas sobre derechos propietarios de titularidad son distintos a los relativos a la división de bienes.

Aunque cada jurisdicción establece el procedimiento de división de bienes matrimoniales que sus tribunales utilizan, existe consenso en que el fin es la repartición justa de cargas y beneficios. Anne-Florence Bock, *Dividing the Assets Upon the Dissolution of a Marriage: A Comparison Between Legal Systems Which Apply a "Hard and Fast Rule" and Systems with a Discretionary Approach to the Division of Assets* en *European Challenges in Contemporary Family Law* (Katharina Boele-Woelki and Tone Sverdrup, eds.), 2008, Portland, Editorial Intersentia, pág. 289; Turner, *op. cit.*, sec. 2:2. Los principios generales que rigen estos procedimientos son: la no discriminación por género, el reconocimiento de la

contribución de cada cónyuge a los asuntos de la familia, la protección de intereses legítimos y la asunción de responsabilidad. *Id.*, págs. 289-90. Asimismo, se considera un valor importante que la adjudicación de la división sea eficaz y predecible. Bock, *op. cit.*, pág. 290; Turner, *op. cit.*

Resulta meridianamente claro que el estatuto real mantiene su relevancia en materia de derechos propietarios, incluso cuando se trata de bienes matrimoniales. Sin embargo, la división de bienes matrimoniales postdivorcio protege intereses y derechos que no necesariamente coinciden con los derechos propietarios de los cónyuges.[142] Debemos entonces hacer eco de las sabias palabras del Juez Presidente señor Trías Monge cuando aseveró que "[d]ebe distinguirse entre diferentes situaciones conflictuales, aun dentro del mismo campo. Los valores envueltos en situaciones distintas o aun superficialmente similares son numerosos y la relación entre ellos varía a menudo." *Toppel v. Toppel*, *ante*, pág. 790.

---

[142] El professor Brett Turner comenta: "Inception of title is a reasonable principle of property and estate law, but as a rule of classification for purposes of divorce, it has become profoundly unpopular. Equitable distribution states have almost uniformly held that property is *acquired* whenever contributions create real value, and not only at the moment when legal title passes." Brett R. Turner, *Equitable Distribution of Property*, West Group, 2005, sec. 3:13, pág. 163.

D.

Si bien algunas jurisdicciones en Estados Unidos extendieron el principio *lex rei sitae* al derecho de familia, la rigidez de este principio se matizó prontamente por la doctrina de la procedencia de los fondos (*source of funds*). *Véanse*, *Restatement (Second) of Conflict of Laws*, secs. 238 y 259, 1971; Harold Marsh, *Marital Property in Conflict of Laws*, Seattle, University of Washington Press, 1952, pág. 102; Turner, *op. cit.*, sec. 5:21, págs. 342-50.[143] Esta última regla dictamina que un bien se clasifica como privativo o matrimonial, según la caracterización del dinero utilizado para su adquisición. Es decir, un bien inmueble que se compra con dinero privativo mantiene su caracterización aunque la adquisición ocurra durante el matrimonio. Marsh, *op. cit.*, pág. 102. De igual forma, si un bien se adquiere con bienes privativos y con bienes matrimoniales, el interés sobre el bien se mantiene en la misma proporción que la aportación del matrimonio y del cónyuge particular.

El efecto práctico de esta doctrina es que un bien inmueble tiene la misma naturaleza, privativa o matrimonial, que tenía el dinero utilizado para su

---

[143] Cabe destacar que el *Restatement* se publicó en 1971, antes de la proliferación de las leyes de distribución equitativa, además de que la discusión incluida se limita a los derechos propietarios del matrimonio o de cada cónyuge. Turner, *op. cit.*, pág. 345.

adquisición. Como señala nuestro estatuto real y el *Restatement*, los bienes muebles se rigen por el domicilio de su propietario o el estado con mayor relación significativa. *Restatement (Second) of Conflicts of Law*, sec. 258, 1971. Por tanto, los estados no aplican el principio *lex rei sitae* propiamente, sino que clasifican los inmuebles igual que los bienes muebles adquiridos durante ese tiempo.

La doctrina también se ha alejado de la aplicación mecánica del *lex rei sitae* en los procedimientos de división, por las complicaciones que suscita. Imaginemos por un momento qué pasaría si una pareja compra durante la vigencia del matrimonio bienes inmuebles en múltiples jurisdicciones. En ese caso, el tribunal tendría que estudiar y aplicar las leyes de cada lugar donde ubican los bienes inmuebles, aunque el matrimonio no haya residido allí. Lo anterior implicaría una carga demasiado onerosa para el tribunal y las partes en el litigio. Igualmente, el tribunal tendría que determinar si la pareja cambió de domicilio durante la vigencia del matrimonio y, de ser así, aplicar la ley de esa jurisdicción a los bienes muebles adquiridos durante ese tiempo.

C.

Por otra parte, el Tribunal afirma que nuestro Código Civil incorporó **"el principio general del derecho estadounidense** respecto a que los bienes inmuebles se regulan totalmente por la ley del lugar en que estén sitos". Al partir de esa premisa, determina que el bien inmueble sito en Florida era privativo porque solamente un cónyuge ostentaba la titularidad exclusiva del bien. Su análisis falla precisamente porque sugiere que la aplicación del principio *lex rei sitae* responde a una supuesta práctica uniforme en los Estados Unidos. Ello no es cierto.

En la actualidad, la doctrina estadounidense prevaleciente reconoce esta distinción y limita, en este ámbito, la aplicación del principio *lex rei sitae* a la determinación del título legal. Turner, *op. cit.*, sec. 3:13. Empero, este principio no se extiende a la etapa de distribución de bienes matrimoniales, pues la mayoría de las jurisdicciones estadounidenses no toman en consideración la titularidad al decretar la división postdivorcio. *Id*. Un estudio de la realidad jurídica en Estado Unidos, deja de manifiesto que no hay un procedimiento uniforme para la caracterización de bienes o su división postmatrimonial. Tampoco existe uniformidad para atender controversias de conflicto de leyes.

Actualmente hay nueve estados[144] cuyo régimen económico matrimonial es la comunidad de bienes, mientras que los otros cuarenta y un estados mantienen la doctrina de separación de bienes, propia del derecho común. Además, aun dentro de estos dos sistemas no hay dos estados con normas iguales. Por ejemplo, cada estado tiene sus propias reglas para preparar el inventario de bienes divisibles y adjudicar la división.

Una minoría de los estados se rige por un sistema de comunidad de bienes, en ausencia de capitulaciones. Las leyes de estos estados siguen la tradición civilista, por lo que establecen un régimen similar a nuestra sociedad legal de gananciales que surte efectos desde la fecha del matrimonio. La protección que ofrece este sistema se observa en la participación como comuneros de derechos propietarios sobre bienes adquiridos durante la vigencia del matrimonio. Oldham, *Divorce, Separation and the Distribution of Property*, *op. cit.* sec. 3.02[5]; Bea Ann Smith, *The Partnership Theory of Marriage: A Borrowed Solution Fails*, 68 Tex. L. Rev. 689, 697-98 (1990). La comunidad también afecta los derechos de los cónyuges una vez se disuelve el matrimonio, sea por muerte o por divorcio. Turner, *op. cit.*, sec. 2:4.

---

[144] Estos estados son Arizona, California, Idaho, Luisiana, Nevada, Nuevo México, Texas, Washington y Wisconsin.

En cuanto a la partición, la mayoría de los estados de comunidad aplica la norma de división de bienes comunes por partes iguales y otorga los bienes privativos exclusivamente a su titular original. *Id.*, pág. 71. Unos pocos de estos estados contemplan la distribución equitativa cuando las circunstancias lo ameritan, lo cual puede favorecer porcentualmente más a uno de los cónyuges. No obstante, existen diferencias en las leyes de estos estados sobre la caracterización de ciertos bienes y otras particularidades del procedimiento de división.

Las jurisdicciones de derecho común adoptaron leyes de distribución de bienes recientemente. El derecho común puro en materia de familia establecía que el matrimonio no surtía efectos sobre los derechos propietarios de los cónyuges. Los bienes que cada cual traía al matrimonio o adquiría durante su vigencia permanecían como bienes separados[145] del cónyuge adquirente en todo momento, incluso después de disuelto el matrimonio. Oldham, *Divorce, Separation and the Distribution of Property*, *op. cit.*, sec. 3.02[1]. Una esposa que no trabajaba fuera del hogar solamente tenía derecho a una pensión postdivorcio, si no tuvo culpa en la causal del divorcio. *Id.*; Turner,

---

[145] El término "separado" será utilizado para distinguir esta clasificación del derecho común del concepto "privativo", propio de los ordenamientos donde impera la comunidad de bienes o nuestra sociedad legal de gananciales.

*op. cit.*, sec. 2:3. En la década de 1970 y 1980, la mayoría de los estados reformaron sus leyes de derecho de familia y acogieron la teoría de que los cónyuges son socios en el matrimonio. Cónsono con lo anterior, se promulgaron leyes para establecer procedimientos de distribución equitativa para proteger al cónyuge dependiente, proveyéndole así estabilidad económica futura. Turner, *op. cit.*, secs. 1:3-1:5.

La distribución equitativa, es un sistema de división de bienes postdivorcio en el que se reconoce un interés de cada cónyuge sobre los bienes matrimoniales. A diferencia de la comunidad, este sistema solamente surte efectos con posterioridad al decreto de divorcio y permite que el juez adjudique los bienes según la distribución que le parezca más equitativa, sin que tenga que ser por partes iguales. Algunos estados preparan el inventario de bienes divisibles a base de la totalidad de los bienes de los cónyuges, incluyendo aquellos adquiridos previos al matrimonio. Oldham, *Divorce, Separation and the Distribution of Property*, *op. cit.* sec. 3.03[2].

La mayoría de los estados de derecho común clasifica los bienes para propósitos del inventario, entre matrimoniales y separados. Los bienes separados se adjudican según la titularidad, mientras que los bienes matrimoniales se distribuyen de forma equitativa. Turner,

*op. cit.*, sec. 2:9. Cabe señalar que como esta distinción no se hace hasta después de disuelto el vínculo matrimonial, durante el matrimonio cada cónyuge tiene derechos propietarios absolutos sobre sus bienes separados. Oldham, *op. cit.*, sec. 3.03[3]. Además, en ciertos casos, si el juzgador lo considera justo, se permite que se adjudiquen bienes privativos de un cónyuge a favor del otro. *Id.*, sec. 3.04[4].

Nótese entonces que hay dos aspectos relativos al conflicto móvil en las relaciones patrimoniales postmatrimoniales: la clasificación de bienes y el procedimiento de división. En este tenor, es preciso destacar que cada jurisdicción estatal tiene sus propias normas respecto a uno y otro tema. Ante esta realidad, la aplicación del principio *lex rei sitae* es inadecuada, pues puede causar que el procedimiento post divorcio resulte excesivamente complejo, engorroso y extenuante. Cabe preguntarnos qué pasaría en el supuesto de una familia que por razones de empleo se establezca inicialmente en un estado, pero cambie periódicamente de domicilio. No hay dos estados con leyes exactamente iguales en cuanto al derecho que rige los bienes durante el matrimonio o la distribución postdivorcio.

Debemos subrayar que clasificar un bien para propósitos del inventario según la ley del lugar de

adquisición, para luego dividirlo de acuerdo a otra ley, ha producido resultados injustos para alguna de las partes, principalmente para el cónyuge dependiente. Merrie Chappell, *A Uniform Resolution to the Problem a Migrating Spouse Encounters at Divorce and Death*, 28 Idaho L. Rev. 993, 1000-03 (1992). Por ejemplo, en un pasado, algunos tribunales de estados donde rige la comunidad de bienes aplicaban el principio *lex rei sitae* para clasificar los bienes al momento de disolución del matrimonio. Sin embargo, la división se hacía conforme a la ley del foro que tenía ante sí la división de los bienes. William W. Bassett, *Repealing Quasi-Community Property: A Proposal to Readopt a Unitary Marital Property Scheme*, 22 U.S.F.L. Rev. 463, 467-69 (1988). Por esta razón, la masa de bienes de la comunidad se limitaba a los bienes que se consideraban matrimoniales.

Como es propio del derecho común, los bienes adquiridos en un estado donde no regía la comunidad de bienes se consideraban separados. Los tribunales en estados de comunidad, al aplicar el principio *lex rei sitae* e intentar adaptar el concepto a su sistema, les adjudicaban carácter privativo. *Id*. Esta práctica tuvo el efecto de que una mujer que había vivido con su esposo en un estado de derecho común, pero que posteriormente se mudaban a un estado donde rige la comunidad de bienes,

recibía una cantidad muy inferior a la que hubiera recibido de haberse clasificado y dividido la totalidad de los bienes a la luz de una ley solamente. Bassett, *op. cit.*, pág. 469.

Algunos estados, como California, donde rige la comunidad de bienes han atendido este conflicto de leyes mediante legislación, al incorporar la doctrina de cuasicomunidad, una modalidad de la norma de mutabilidad. Se refiere a la caracterización que se le da, en un procedimiento de división, a los bienes adquiridos fuera de la jurisdicción del foro pero que si se hubieran adquirido en la jurisdicción del foro se considerarían bienes de la comunidad.[146] La aceptación de esta normativa se observa en la proliferación de leyes similares en otros estados donde rige la comunidad matrimonial de bienes.[147]

La aplicación del principio *lex rei sitae* al procedimiento de división de bienes, requeriría que un tribunal tenga que estudiar y aplicar leyes del derecho de familia de múltiples jurisdicciones para clasificar y dividir cada bien. Es por ello que se considera que cuando un conflicto se refiere a controversias internas entre cónyuges, se debe aplicar la misma ley a bienes

---

[146] *Id.*; Turner, *op. cit*, sec. 3:13.

[147] *Véase* Ariz. Rev. Stat. Ann sec. 25-318(A); Cal. Civ. Code sec. 125; La. Civ. Code Ann. Art. 3526; N.M. Stat. Ann. Sec. 40-3-8(C)(1); Tex. Fam. Code Ann. sec. 7.002.

muebles e inmuebles. Marsh, *op. cit.*, pág. 110. Asimismo, para evitar la aplicación defectuosa de una norma u otra, se favorece la utilización de una ley única para la clasificación y división de la totalidad de los bienes. A esta doctrina se le ha denominado el principio de unicidad patrimonial y es la práctica favorecida no tan sólo en la mayoría de las jurisdicciones en Estados Unidos, Turner, *op. cit.*, sec. 3.13, pág. 159, nota 7, sino también por los países civilistas.[148] En nuestro ordenamiento impera esta normativa, la cual extendimos a casos en que hay conflicto de leyes en *Toppel v. Toppel*, *ante*, págs. 790-91, pero que hoy este Tribunal injustificadamente abandona.

IV.

Contrario a lo que el Tribunal pretende afirmar, no cabe hablar de una norma uniforme en Estados Unidos sobre conflicto de leyes en el ámbito de división de bienes matrimoniales. Tampoco puede aseverarse que la práctica generalizada es la aplicación del principio *lex rei sitae* a los procedimientos de clasificación y división postdivorcio de bienes matrimoniales. El estatuto real no responde a los intereses relacionados a la división de

---

[148] Cabe destacar, sin embargo, que el principio *lex rei sitae* y la distinción entre los tipos de bienes mantiene su importancia en otros ámbitos de derecho, como en acciones relativas a la titularidad de un bien o a los derechos de terceras personas sobre bienes matrimoniales. Marsh, *op. cit.*, pág. 110.

bienes matrimoniales. Su propósito es cónsono con la protección de derechos propietarios, no así con el interés de dividir los bienes matrimoniales de forma justa y equitativa para asegurar la estabilidad económica futura de cada cónyuge.

Lo cierto es que cada jurisdicción adopta la doctrina o modalidad que le parece que mejor protege los intereses de las partes, entre otras consideraciones. Así hicimos en *Toppel v. Toppel*, luego de considerar varias de las tendencias modernas en esta área. De conformidad con la doctrina del precedente, ésta es la norma de conflicto de leyes aplicable a la controversia de autos. No existe razón para abandonar esta norma, pues responde a la realidad de nuestros tiempos y a las corrientes doctrinales modernas.

Por todo lo anterior, disiento de la Opinión de la mayoría de este Tribunal.


                              Anabelle Rodríguez Rodríguez
                                     Juez Asociada